[L.A. No. 29949. In Bank. Apr. 24, 1972.]

THOMAS HALPIN et al., Petitioners, v.
THE SUPERIOR COURT OF SAN BERNARDINO COUNTY,
Respondent;
THE PEOPLE, Real Party in Interest.

## COUNSEL

Paul G. Sloan, Friedman, Sloan & Bresee, Friedman & Sloan, Miller, Glassman & Browning and Anthony Michael Glassman for Petitioners.

Paul N. Halvonik, Charles C. Marson, A. L. Wirin, Fred Okrand, Lawrence R. Sperber, Karlton, Blease & Vanderlaan and Coleman A. Blease as Amici Curiae on behalf of Petitioners.

No appearance for Respondent.

Evelle J. Younger, Attorney General, Herbert L. Ashby, Chief Assistant Attorney General, Doris H. Maier, Assistant Attorney General, S. Clark Moore and Russell Iungerich, Deputy Attorneys General, Lowell E. Lathrop, District Attorney, and Joseph D. Canty, Jr., Deputy District Attorney, for Real Party in Interest.

## OPINION

**WRIGHT, C. J.**—On February 3, 1971, petitioners Thomas and Rebecca Halpin, husband and wife, and Martin Silva were charged by indictment with conspiracy to transport marijuana (Pen. Code, § 182, subd. 1; Health & Saf. Code, § 11531), transportation of marijuana (Health & Saf. Code, § 11531) and possession of marijuana for sale (Health & Saf. Code, § 11530.5). The trial court denied their motions to set aside the indictment (Pen. Code, § 995) and to suppress evidence (Pen. Code, § 1538.5) which consisted of over 500 pounds of marijuana seized pursuant to an allegedly invalid search warrant and an incriminating tape recording made by police officers who eavesdropped on a conversation initiated by Halpin to his wife from a telephone located within the jail facility. Petitioners now seek a statutory writ of mandate (Pen. Code, § 1538.5, subd. (i)) to compel the trial court to suppress the aforementioned evidence. For reasons hereinafter set forth, we hold that the marijuana and the tape recording must be suppressed as evidence and that a peremptory writ of mandate must issue.

At the outset we deem it appropriate to state that we are compelled to declare invalid the warrant which was issued in connection with the search of the vehicle and the subsequent seizure of the marijuana since the magistrate failed to follow the basic requirements for the issuance of such a warrant enunciated in 1964 by the Supreme Court in *Aguilar* v. *Texas*, 378 U.S. 108 [12 L.Ed.2d 723, 84 S.Ct. 1509]. The two-pronged test spelled out in that decision is not difficult to comprehend or follow.[1] Magistrates and law enforcement agencies, however, continue to manifest confusion.

---

[1] In *Aguilar* v. *Texas* (1964) 378 U.S. 108 [12 L.Ed.2d 723, 84 S.Ct. 1509], the Supreme Court stated that "an affidavit [in support of a search warrant] may be based on hearsay information and need not reflect the direct personal observations

Some, while expressing a threshold knowledge of the requirements of *Aguilar,* treat them with unwarranted perfunctoriness. An example of such is illustrated by the colloquy between the magistrate who issued the search warrant and the deputy district attorney in the instant case.[2]

of the affiant . . . [but] the magistrate must be informed of [1] some of the underlying circumstances from which the informant concluded that the narcotics were where he claimed they were, and [2] some of the underlying circumstances from which the officer concluded that the informant, whose identity need not be disclosed . . . was 'credible' or his information 'reliable.' " (*Id.* at p. 114 [12 L.Ed.2d at p. 729].)

[2]After Detective Cole of the Ontario Police Department testified in support of the search warrant (Pen. Code, § 1526, subd. (b)) the deputy district attorney and the magistrate engaged in the following conversation:

"The Court: I am satisfied with the search warrant if you are satisfied that you have completely complied in the following respects, sir: We have in the law several cases where the officer received information by radio by the dispatcher or another officer, which imparts information that then gives probable cause. Are you prepared to call the officer who transmitted the information to him to supplement your probable cause? In other words, how did that man who sent the information over the radio get his information, and is that reliable? If you are satisfied on that aspect I will go along with this.

"Mr. [Deputy District Attorney]: I believe, your Honor, the state of the record before the Court is that information from a reliable source, the Captain of the Pomona Police Department, was furnished to the Ontario Police Department, that this particular office in Pomona had prior experience with this particular defendant—

"The Court: That could be hearsay.

"Mr. [Deputy District Attorney]:—and that the information furnished by the Pomona Police Captain in every particularity, and the information furnished by the informant to the police captain, and then to the Ontario Police Department, was found to be true. And under these circumstances I believe there was a basis for showing through the conduct and information furnished by the reliable informant there is a basis for the search of the truck presently in custody and under the control of the officials—

". . . . . . . . . . . . . . . . . .

"The Court: This will almost beyond a doubt be contested. Now, let me ask you this, sir, are you allowed in anyway [*sic*] to supplement the showing up at this point on 1538.5 motion or a motion to suppress or any of the numerous ways it could be attacked by bringing in Captain Mooney to testify directly?

"Mr. [Deputy District Attorney]: I suppose this should be off the record. I don't think there would be anything further to add to the record unless the Court has anything particular in mind.

"The Court: No, I have nothing in mind, except I just wondered if you could present additional testimony if you deemed it advisable at the time of a hearing on a 1538.5 and supplementing what you have on the record so far.

"Mr. [Deputy District Attorney]: As a general state of law, I believe there are two ways such additional information could be presented, and if the Court feels there is need for it I will bring those people here now.

"The Court: I would rather not cause any delay here unless it is absolutely essential because that truck is under surveillance. Anything can happen out there, and the quicker you get there with a search warrant I think the quicker the interests of justice can be served.

"Mr. [Deputy District Attorney]: I assume from that the Court is satisfied with the People's showing of—

". . . . . . . . . . . . . . . . . .

"The Court: I am satisfied. I can see trouble coming up on that point at the

■ Courts do not require that an affidavit in support of a search warrant be drafted with the precision of a model legal instrument nor interpreted in a hypertechnical manner.[3] However, once it is determined that a search without a warrant cannot be conducted under any of the well-recognized exceptions, *Aguilar* must be followed. "[T]he court must still insist that the magistrate perform his 'neutral and detached' function and not serve merely as a rubber stamp for the police." (*Aguilar* v. *Texas, supra,* 378 U.S. 108, 111 [12 L.Ed.2d 723, 727].)

On December 14, 1970, between 2:30 and 3 p.m., police officers, including Detective Cole of the Ontario Police Department, stopped a white and green 1971 Ford Sport Custom camper truck in the City of Ontario. Previously Cole had received information that a camper of the same description contained marijuana reputedly worth $100,000. After the truck pulled over to the curb the driver "jumped out of the truck, and as he did so he locked [it]." He was immediately placed under arrest and a search of his person produced a driver's license bearing the name of "Thomas Allon Halpin." Halpin declined to permit a search of the camper.

Cole then left the truck and Halpin in the custody of the other officers and proceeded to the chambers of the local magistrate to testify in support of an oral application for a search warrant.[4] Cole testified before the magistrate that "Captain Mooney [of the Pomona Police Department] called me [at 8:05 a.m. this morning], informing me that at a Havasu Trailer Company at 1515 West Holt I would find a 1971 Ford Sport Custom truck, white color with a dark green roof, and on this truck would be a ten and a half foot Havasu camper, cream color, with a darker wood—simulated wood—panel. He informed me that the truck would have a temporary license in the rear window, giving me a number of 1291208. He stated that

---

hands of a skillful defense attorney who is now going to strike at the very vitality of the information over the radio and how Captain Mooney had his probable cause and how he acquired his information. That is why I raised the query, if this could be supplemented with further testimony.

"MR. [Deputy District Attorney]: Of course the Court is raising an issue that I have to deal with on the record, that is, are you personally satisfied with the probable cause shown here today?

"THE COURT: Yes, but with some reluctance because I can see some loose parts of the dike, and somebody is going to have to act like the Dutch boy with his finger in the hole at some future time."

[3]We include oral testimony in support of search warrants. (See fn. 2, *supra;* fn. 4, *infra.*)

[4]Penal Code section 1526, subdivision (b), provides for oral testimony in support of a search warrant as follows: "In lieu of the written affidavit required in subdivision (a), the magistrate may take an oral statement under oath which shall be recorded and transcribed. The transcribed statement shall be deemed to be an affidavit for the purposes of this chapter."

this camper body would have a false type body and contained approximately $100,000 worth of marijuana. He stated that a white male known to him only as Tom [who apparently would be driving the camper] would be arriving in San Bernardino on a flight from San Diego. He described this male as being approximately six foot and weighing 160 to 170 pounds. He stated he had sandy hair, a mustache and wore horn-rimmed glasses. . . . At this time he did state that this truck would be parked next to a blue Chevrolet. . . . I asked him about [the informant's] reliability, and he stated that on November 30 he had received similar information from this informant which he gave to the San Francisco Police Department, which resulted in an arrest. At this time a Havasu camper was loaded similar to the one he described here and contained [a very large haul] of marijuana."

Cole further testified before the magistrate that after receiving this information he drove to the Havasu Trailer Company and, about 8:40 a.m., observed in the company's lot the truck which Captain Mooney had described to him. Cole called the sheriff's narcotic division for assistance and the officers began a surveillance of the truck about 9:30 a.m. At 11:30 a Volkswagen automobile drove into the parking lot. The frame around the license plate bore the name of a San Diego car dealer and the man (petitioner Halpin) in the car fit the description earlier given to Cole. Halpin left the automobile and went into the trailer company office. He remained there a short while then returned to the Volkswagen and drove away. Officers followed Halpin for a while but determined that if they continued they might breach the integrity of their surveillance and they thereupon returned to their positions near the Havasu Trailer Company. About 2:30 p.m. the Volkswagen returned to the camper lot. Halpin went into the company office, remained there a short while, and thereafter entered the camper and drove off. Cole and other officers followed for a short distance before Cole pulled up alongside, showed Halpin his badge and motioned to him to pull over to the curb.

The search warrant was issued solely on the foregoing testimony. The subsequent search of the camper produced over 500 pounds of marijuana.

Halpin was removed to the San Bernardino County jail and, after being booked, was granted permission to make a telephone call using the telephone within the custodial facilities. Halpin informed Deputy Sheriff Warren Hockanson of the number—but not of the name—of the party he wished to call, and Hockanson dialed it for him. (It was later determined that Halpin was calling his wife in San Diego.) Hockanson apparently left the room shortly after the conversation began and before incriminating

statements were made by Halpin and his wife.[5] Unknown to either of them, their conversation—in which they incriminated themselves and petitioner Silva—was monitored and tape recorded and later replayed before the grand jury.

## I. The Search Warrant

■ Petitioners initially contend that the testimony offered by Cole in support of the search warrant was constitutionally inadequate since it failed to reflect the underlying circumstances from which the issuing judge could conclude that the informant had personal knowledge of the information which he supplied to the police and that the informant was credible or his information reliable. Petitioners thus argue that the testimony failed to satisfy the test which the Supreme Court announced in *Aguilar* v. *Texas, supra,* 378 U.S. 108, 114 [12 L.Ed.2d 723, 728-729], for the determination of the sufficiency of affidavits based upon the hearsay statements of an informant. We agree.

The first prong of *Aguilar's* two-pronged test requires that the magistrate be informed of some of the underlying circumstances from which the informant concluded that the items to be seized were where he claimed they were. In accordance with *Aguilar,* this court in *People* v. *Hamilton* (1969) 71 Cal.2d 176, 179-180 [77 Cal.Rptr. 785, 454 P.2d 681] required that "the affidavit . . . allege the informant's statement in language that is factual rather than conclusionary and must establish that the informant spoke with personal knowledge of the matters contained in such statement."

In *Hamilton* the affidavit offered in support of the search warrant contained in relevant part the following allegations: " 'That said affiant was informed on July 13, 1967, by confidential reliable informant that Jane Doe Nora also known as Nora Mae Hamilton and John Doe Tony have in their possession at a white single story, one family dwelling located at 822 W. Alpine Street, Upland, Calif. approximately three hundred (300) rolls of dangerous drugs wrapped in tin foil in groups of ten pills per roll.

---

[5]The record is not entirely clear on this point. The only questions asked of Hockanson concerning his presence during the call were as follows: "Q [Deputy District Attorney]: And were you present when he [Halpin] made a telephone call? A [Hockanson]: Yes, sir, I was. Q: Did you participate in the placing of that call? A: Yes, sir, I placed the call." Hockanson was not asked whether he was present during a part of or the entire conversation. However, in view of the incriminating statements Halpin made, and an admonition by his wife to "Remember your rights and don't say anything," it is unlikely that Hockanson was present. The factual issue might be important on a claim that Halpin had consented to the monitoring. The People, of course, would be required to establish such a waiver and it appears that had Hockanson been present during any portion of the call they would have established that fact.

[¶] That further your affiant reviewed San Bernardino County Sheriff Office report No. D.R. 112302 which indicated Nora Mae Hamilton and Raymond David Padilla were arrested at 822 W. Alpine Street, Upland, California, on April 14, 1967 for Possession of Marijuana and Possession of dangerous drugs found there. The pills found in the April 14, 1967 arrest were amphetamine, wrapped in tin foil in groups of 10. [¶] That said confidential reliable informant has furnished information in the past which has lead [*sic*] to eight (8) arrest[s] and convictions for narcotic and dangerous drug offense[s].' " (*People* v. *Hamilton, supra,* 71 Cal.2d at p. 179.) We held that the affidavit failed to set forth allegations sufficient to enable the issuing magistrate to determine whether the informant had *personal knowledge* of the circumstances which he described. Moreover, we concluded that the information so provided was not sufficiently detailed to permit even the inference that the informant had personal knowledge.[6] (*People* v. *Hamilton, supra,* 71 Cal.2d at p. 181.)

The testimony offered in support of the search warrant in the instant case contains information of a general nature similar to that in the affidavit in *Hamilton.* The tip in this case merely indicated that Cole would find a certain, well-described truck containing marijuana at a particular location and that a person described with particularity would take possession of it. The magistrate was not provided with a sufficient statement of the underlying circumstances from which he could evaluate the validity of the informer's conclusion that "Tom" was handling, transporting or selling marijuana. For example, it is not alleged that the informant personally observed Halpin or others handling or transporting the marijuana, or that the informant had had dealings with "Tom" or any other person in connection with the camper, and it cannot be inferred that the informant gained his knowledge in any reliable way. (*Spinelli* v. *United States* (1969) 393 U.S. at p. 417 [21 L.Ed.2d at p. 644].) It is thus apparent that Mooney's informant could as likely have obtained the information from an "offhand remark heard at a neighborhood bar," as from personal observations or some other reliable source.[7] (*Id.*)

---

[6]We did not reject the possibility that sufficiently detailed information supplied by an informant in the absence of "factual allegations of his own experience" could warrant such an inference in a proper case. (*People* v. *Hamilton* (1969) 71 Cal.2d 176, 181 [77 Cal.Rptr. 785, 454 P.2d 681]; see also *Spinelli* v. *United States* (1969) 393 U.S. 410, 417 [21 L.Ed.2d 637, 644, 89 S.Ct. 584]; *id.* at pp. 425-426 [21 L.Ed.2d at pp. 649-650] (White, J., concurring).)

[7]It should be noted that merely because knowledge sufficient to satisfy *Aguilar's* first prong is gained in a reliable way does not automatically mean such information satisfies *Aguilar's* second prong. (See fn. 1, *supra; Spinelli* v. *United States, supra,* 393 U.S. 410, 417, 425-426 [21 L.Ed.2d 637, 644, 649-650] (White, J., concurring).) *Aguilar's* second prong primarily concerns the police officer's past experience with the informant.

"In the absence of a statement detailing the manner in which the information was gathered, it is especially important that the tip describe the accused's criminal activity in sufficient detail that the magistrate may know that he is relying on something more substantial than a casual rumor circulating in the underworld or an accusation based merely on an individual's general reputation." (*Spinelli* v. *United States, supra*, 393 U.S. 410, 416 [21 L.Ed.2d 637, 644].) Although the camper and Halpin were described in detail, the circumstances related by Cole did not describe any activity by Halpin or others which might be deemed as sufficiently criminal to warrant a belief on the part of the magistrate that Mooney's informant relied "on something more substantial than a casual rumor circulating in the underworld or an accusation based merely on an individual's general reputation."

Citing *People* v. *Benjamin* (1969) 71 Cal.2d 296, 302-303 [78 Cal.Rptr. 510, 455 P.2d 438], the People alternatively argue that even if the hearsay statements of Mooney's informant were not sufficient in themselves to justify the issuance of the warrant, when combined with the officers' observations the issuing magistrate could reasonably be led to believe that Halpin was transporting and selling marijuana.

The affidavit in support of the warrant in *Benjamin* was "quite extensive and reflected an investigation of defendant's activities which had taken place over a period of more than two months." (*People* v. *Benjamin, supra*, 71 Cal.2d at p. 299.) The information there provided by the informant, which appeared in the affidavit, was to the effect that the officer-affiant had received information from a confidential reliable informant that defendant was accepting wagers from bettors at a specifically described location and, three months later, at a specified telephone number. The content of the remaining allegations concerned the officer's already existing knowledge as to the same type of illegal activity and their subsequent investigation and observations over a two-month period.[8] Although we there concluded

---

[8]That information was summarized as follows: "[1] that affiant himself knew that bookmaking operations had previously been carried on in the same shoe repair shop by another person, and the shop was placed under surveillance; [2] that affiant there observed defendant meet and converse with persons known to affiant to be betters and after each such meeting observed defendant go to a public telephone and make a telephone call; [3] that one of affiant's fellow officers overheard one of such telephone calls wherein defendant made statements indicating that he was taking bets and wished to 'work a phone spot,' namely a location in which wagers are accepted by telephone; . . . [4] that affiant traced the telephone number to a specific apartment which was then placed under surveillance; [5] that on six specific dates in the month of March 1967 affiant and other officers observed defendant arriving at the subject apartment (which was not defendant's residence) at about 10 a.m. and remaining there until about 5:30 p.m., at which time he departed therefrom; [6] that on each of such dates horse racing was being conducted at racetracks within the

"without hesitation that the hearsay statements of the informant were not sufficient *in themselves* to justify issuance of the warrant," we held that "the combination of that information with the officers' own observations produced a state of facts sufficient to lead the magistrate, as one of ordinary caution or prudence, to believe and conscientiously entertain a strong suspicion that defendant was engaged in [illegal activities]." (*People* v. *Benjamin, supra,* 71 Cal.2d 296, 301, 303 (italics in original); see also *Spinelli* v. *United States, supra,* 393 U.S. 410, 415 [21 L.Ed.2d 637, 643].)

In the instant case, Cole's observations were not of the same character as those of the officers in *Benjamin.* Those officers already had knowledge of some of the illegal bookmaking activity described by their informant, and their investigation and observations thereafter continued over a period of more than two months. During that period of time they kept the suspected location under surveillance, saw the defendant meet with known bettors and conduct transactions from which the experienced officers could conclude that bookmaking activities were being carried on. (*People* v. *Benjamin, supra,* 71 Cal.2d at pp. 299-300.) Here, Cole observed only the seemingly innocent activity of Halpin as he entered and left the Havasu Trailer Company office and subsequently drove the camper away. (Cf. *People* v. *Madden* (1970) 2 Cal.3d 1017, 1023-1024 [88 Cal.Rptr. 171, 471 P.2d 971]; *Price* v. *Superior Court* (1970) 1 Cal.3d 836, 842 [83 Cal.Rptr. 369, 463 P.2d 721].) Unquestionably, the inferences to be drawn from the account of the observations presented to the issuing magistrate in *Benjamin* were significantly conclusive of illegal activity. The account of the observations presented to the issuing magistrate in the instant case instead of corroborating claims of illegal activity suggested no criminal activity whatsoever and were entirely consistent with innocent conduct.

It should also be noted that although Cole testified that on November 30 Mooney had received similar information from the same informant which resulted in an arrest, such information is relevant only for purposes of

---

United States, and the first race for the day was run shortly after defendant's entry into the subject apartment, and the last race for the day was run shortly before his departure: [7] that on March 9, 1967, after leaving the subject apartment, defendant proceeded to a certain club frequented by one Canard, the head of the bookmaking organization of which defendant was suspected to be a member; [8] that on that date he left the club with Canard, drove him to certain locations within the city, and waited while Canard made brief visits at such locations; [9] that on Saturday, March 11, 1967, after leaving the subject apartment, defendant again drove to the club and entered; [10] that affiant on the basis of prior experience knew that Canard customarily met on Saturday evenings with that member of the organization responsible for keeping permanent records of wagers in order to receive and examine said records for the week; [11] and that affiant on several occasions dialed the telephone number assigned to the subject apartment after 6 p.m. and received no answer." (*People* v. *Benjamin, supra,* 71 Cal.2d 296, 299-300.)

*Aguilar's* second prong. (See fns. 1, 7, *supra.*) Since we conclude that the affidavit consisting of the transcription of Cole's testimony before the magistrate fails to satisfy the first prong of the *Aguilar* test, we need not reach the issue whether the informant, by virtue of the information he previously supplied to Mooney, could be deemed reliable within the meaning of the second prong of that test.

## II. The Electronic Surveillance

██ Petitioners contend that the electronically monitored and tape-recorded conversation between Halpin and his wife is inadmissible because it violated their rights under title III of the Omnibus Crime Control and Safe Streets Act of 1968 (18 U.S.C. §§ 2510-2520), the Fourth Amendment to the Constitution of the United States and the California Invasion of Privacy Act (Pen. Code, §§ 630-637.2).

Petitioners argue that Congress, in enacting title III, intended to pre-empt state legislation in the field of wiretapping and electronic surveillance and that since prior judicial approval was thus required but was not obtained for the tap, the telephone conversation between Halpin and his wife is inadmissible. ██ The People maintain that title III is unconstitutional as applied because it constitutes an unreasonable infringement upon California's right, reserved to it by the Tenth Amendment, to regulate and administer the internal affairs of its penal institutions.[9]

Section 2511 of title 18 of the United States Code makes it a crime, subject to the exceptions contained in subdivisions (2)(a) through (3) of that section, to wilfully intercept or disclose any wire or oral communication.[10]

---

[9]Title III has been held constitutional. (See, e.g., *United States* v. *Perillo* (D. Del. 1971) 333 F.Supp. 914 (title III conforms to *Berger* and *Katz*); *United States* v. *Leta* (M.D.Pa. 1971) 332 F.Supp. 1357 (title III constitutional on its face); *United States* v. *Scott* (D.D.C. 1971) 331 F.Supp. 233 (title III constitutional on its face); *United States* v. *Cantor* (E.D.Pa. 1971) 328 F.Supp. 561 (title III "sufficiently circumscribed" to protect rights of the individual guaranteed by the Fourth Amendment); *United States* v. *Sklaroff* (S.D.Fla. 1971) 323 F.Supp. 296 (title III not unconstitutional on invasion of privacy grounds); *United States* v. *Escandar* (S.D.Fla. 1970) 319 F.Supp. 295 (title III not unconstitutional on its face); see also *United States* v. *Cox* (10th Cir. 1971) 449 F.2d 679. But see, e.g., Schwartz, *The Legitimation of Electronic Eavesdropping: The Politics of "Law and Order"* (1969) 67 Mich. L. Rev. 455; Comment, *Electronic Surveillance by Law Enforcement Officers* (1969) 64 Nw. U. L. Rev. 63; Note, *Wiretapping and Electronic Surveillance—Title III of The Crime Control Act of 1968* (1969) 23 Rutgers L. Rev. 319.)

[10]Section 2511 provides in subdivision (1): "Except as otherwise specifically provided in this chapter any person who—
"(a) willfully intercepts . . . any wire or oral communication;
"(b) willfully uses . . . any electronic, mechanical, or other device to intercept any oral communication . . .
" . . . . . . . . . . . . . . . . . .

"Wire communication" is defined by section 2510(1) as "any communication made . . . through the use of facilities for the transmission of communications by the aid of wire . . . or other like connection between the point of origin and the point of reception furnished or operated by any person engaged as a common carrier in providing or operating such facilities for the transmission of interstate or foreign communications."[11] "[O]ral communication" is defined by section 2510(2) as "any oral communication uttered by a person exhibiting an expectation that such communication is not subject to interception under circumstances justifying such expectation." Section 2515 makes inadmissible any evidence, and the fruits thereof, obtained in violation of sections 2510-2520.[12] The other sections are not here relevant.

█ Sections 2510-2520 were drafted to meet the standards of *Berger*

---

"(c) willfully discloses . . . to any other person the contents of any wire or oral communication, knowing or having reason to know that the information was obtained through the interception of a wire or oral communication in violation of this subsection; or

"(d) willfully uses . . . the contents of any wire or oral communication, knowing or having reason to know that the information was obtained through the interception of a wire or oral communcation in violation of this subsection; shall be fined not more than $10,000 or imprisoned not more than five years, or both."

In the Senate Report on the Omnibus Crime Control and Safe Streets Act of 1968 (Sen. Comm. on the Judiciary, Omnibus Crime Control and Safe Streets Act of 1968, Sen. Rep. No. 1097, 90th Cong., Second Sess. (1968) [hereinafter cited as Senate Report]) section 2511 was explained in part as follows:

"Section 2511 of the new chapter prohibits, except as otherwise specifically provided in the chapter itself, the interception and disclosure of all wire or oral communications. Paragraph (1) sets out several prohibitions. Subparagraph (a) prohibits the interception itself. This eliminates the requirement under existing law that an 'interception' and a 'divulgence' must take place. See *Massicot* v. *United States* [(5th Cir. 1958) 254 F.2d 58, certiorari denied (1958) 358 U.S. 816 (3 L.Ed.2d 58, 79 S.Ct. 23)]; *Benanti* v. *United States* [(1957) 355 U.S. 96, 102 fn. 10 (2 L.Ed.2d 126, 131, 78 S.Ct. 155)].

"Subparagraph (a) establishes a blanket prohibition against the interception of any wire communication. Since the facilities used to transmit wire communications form part of the interstate or foreign communications network, Congress has plenary power under the commerce clause to prohibit all interception of such communications, whether by wiretapping or otherwise. (*Weiss* v. *United States* [(1939) 308 U.S. 321 (84 L.Ed. 298, 60 S.Ct. 269)].)" (Sen. Rep., *supra,* at pp. 91-92.)

[11]In the Senate Report "wire communication" was defined "to include all communications carried by a common carrier, in whole or in part, through our Nation's communications network. The coverage is intended to be comprehensive." (Sen. Rep., *supra,* at p. 89.)

[12]Section 2515 provides: "Whenever any wire or oral communication has been intercepted, no part of the contents of such communication and no evidence derived therefrom may be received in evidence in any trial, hearing, or other proceeding in or before any court, grand jury, department, officer, agency, regulatory body, legislative committee, or other authority of the United States, a State, or a political subdivision thereof if the disclosure of that information would be in violation of this chapter." (See also Sen. Rep., *supra,* at p. 96.)

v. *New York* (1967) 388 U.S. 41 [18 L.Ed.2d 1040, 87 S.Ct. 1873] and *Katz* v. *United States* (1967) 389 U.S. 347 [19 L.Ed.2d 576, 88 S.Ct. 507].[13] (Sen Rep., *supra,* at p. 66.)[14] The legislation "has as its dual purpose (1) protecting the privacy of wire and oral communications, and (2) delineating on a uniform basis the circumstances and conditions under which the interception of wire and oral communications may be authorized." (Sen. Rep., *supra,* at p. 66.)[15] ▆▆ An intent to have certain provisions of the law completely occupy the field of wiretapping and electronic surveillance is evidenced by their plain and all-inclusive wording. (See *Allen B. Dumont Laboratories* v. *Carroll* (3d Cir. 1950) 184 F.2d 153, 155.) Section 2511(1)(a) provides penal sanctions for "any person who willfully intercepts . . . *any* wire or oral communication," and section 2510(1) defines "wire communication" as *"any* communication made . . . through the use of facilities . . . furnished or operated by . . . a common carrier . . . for the transmission of interstate or foreign communications." (Italics added.) That Congress intended to enact comprehensive national legislation, against which all then existing federal and state legislation was to be measured, is also illustrated by the comments of the Senate Committee on the Judiciary.[16] At the same time, however, Con-

---

[13]But see, e.g., Schwartz, *supra,* 67 Mich. L. Rev. 455; Comment, *supra,* 64 Nw. U. L. Rev. 63; Note, *supra,* 23 Rutgers L. Rev. 319.

[14]The House Committee on the Judiciary also made a similar report (No. 488, July 17, 1967). The House bill was passed in lieu of the Senate bill after the text of the Senate bill was substituted for that of the House bill. (2 U.S. Code Cong. & Admin. News 2112 (90th Cong., Second Sess. (1968)).)

[15]The comments in the Senate Report concerning the purpose of title III are as follows: "[¶] Because of the complexity in the area of wiretapping and electronic surveillance, the committee believes that a comprehensive and in-depth analysis of title III would be appropriate in order to make explicit congressional intent in this area. [¶] Section 801.—Section 801 [Pub. L. 90-351] contains the findings relating to the conditions with which the proposed legislation is designed to deal, and of the actions necessary to cope with those conditions. . . . Paragraph (b) recognizes that to protect the privacy of wire and oral communications, to protect the integrity of court and administrative proceeding[s] and to prevent the obstruction of interstate commerce, it is necessary for Congress to define on a uniform basis the circumstances and conditions under which the interception of wire or oral communications may be authorized. It also finds that all unauthorized interception of such communications should be prohibited, as well as the use of the contents of unauthorized interceptions as evidence in courts and administrative hearings." (Sen. Rep., *supra,* at pp. 88-89.)

[16]The following comments in the Senate Report indicate that intent: "Both proponents and opponents of wiretapping and electronic surveillance agree that the present state of the law in this area is extremely unsatisfactory and that the Congress should act to clarify the resulting confusion." (Sen. Rep., *supra,* at p. 67.) "On the State level, there is little uniformity. . . . Only a few States have enacted statutes dealing with other forms of electronic surveillance. . . . Even those existing statutes, however, must now be reformed in light of the standards for constitutional electronic surveillance laid down by the Supreme Court in *Berger* v. *New York* [(1967) 388

gress left room for the states to supplement the law in certain areas,[17] provided the regulations are not more permissive. (See, e.g., Sen. Rep., *supra,* at pp. 98-99.)

 Congress' authority in enacting legislation to accomplish its asserted purpose is said to emanate from its plenary power under the commerce clause (see, e.g., *Prudential Ins. Co.* v. *Benjamin* (1946) 328 U.S. 408, 423 [90 L.Ed. 1342, 1356-1357, 66 S.Ct. 1142, 164 A.L.R. 476]; see also *Atlanta Motel* v. *United States* (1964) 379 U.S. 241 [13 L.Ed.2d 258, 85 S.Ct. 348]; *Weiss* v. *United States* (1939) 308 U.S. 321 [84 L.Ed. 298, 60 S.Ct. 269]; cf. *American Power Co.* v. *S.E.C.* (1946) 329 U.S. 90 [91 L.Ed. 103, 67 S.Ct. 133]) to regulate telegraph and telephone lines as instrumentalities of interstate commerce (*Western Union* v. *Lenroot* (1945) 323 U.S. 490, 502 [89 L.Ed. 414, 423, 65 S.Ct. 335])[18] and the right of privacy "arising under certain provisions of the Bill of Rights and the due process clause of the Fourteenth Amendment."[19] Since title III is a valid exercise of Congress' power under particular provisions of the Constitution, we reject the People's contention that it is unconstitutional as applied because it infringes upon the police power of the state, reserved to it by the Tenth Amendment, to regulate the internal discipline of its penal institutions. "[T]he [Tenth] amendment has been construed as not depriving the

---

U.S. 41 (18 L.Ed.2d 1040, 87 S.Ct. 1873)] and *Katz* v. *United States* [(1967) 389 U.S. 347 (19 L.Ed.2d 576, 88 S.Ct. 507)]." (It should be noted at this point that the California Invasion of Privacy Act became effective on November 7, 1967; *Berger* was decided on June 6, 1967 and *Katz* was decided on December 18, 1967.) "[¶] . . . The need for comprehensive, fair and effective reform setting uniform standards is obvious. New protections for privacy must be enacted. Guidance and supervision must be given to State and Federal law enforcement officers. This can only be accomplished through national legislation." (Sen. Rep., *supra,* at p. 69.) See also Comment, *Electronic Surveillance in California: A Study in State Legislative Control* (1969) 57 Cal.L.Rev. 1182, 1197, 1199-1200.

[17]The Senate Report specifically indicates areas in which the Congress did not intend to preempt state legislation; for example: the degree of disclosure and scope of knowledge required to violate section 2511 (Sen. Rep., *supra,* at p. 93); the provisions of section 2512 banning the manufacture, distribution, possession and advertisement of interception devices (Sen. Rep., *supra,* at p. 94); rules in section 2516 governing the authorization of intercepting communications (Sen. Rep., *supra,* at p. 98); and provisions in section 2520 authorizing the recovery of civil damages (Sen. Rep., *supra,* at p. 107). See also *Pennsylvania* v. *Nelson* (1956) 350 U.S. 497 [100 L.Ed. 640, 76 S.Ct. 477]. We do not determine whether 18 U.S.C. §§ 2510-2520 or the Senate Report have authorized the federal government to regulate areas of electronic eavesdropping solely within the legislative domain of this state, or whether it has inadvertently failed to indicate other areas in which it intended to set standards.

[18]Section 605 of the Communications Act of 1934—the predecessor of title III (Sen. Rep., *supra,* at p. 107) was a comprehensive scheme for regulating interstate communication. (*Benanti* v. *United States* (1957) 355 U.S. 96, 105 [2 L.Ed.2d 126, 132-133, 78 S.Ct. 155].)

[19]See Senate Report, *supra,* at page 92.

national government of authority to resort to all means for the exercise of a granted power which are appropriate and plainly adapted to the permitted end." (*United States* v. *Darby* (1941) 312 U.S. 100, 124 [85 L.Ed. 609, 622, 61 S.Ct. 451, 132 A.L.R. 1430].) "It is no objection to the assertion of the power to regulate interstate commerce that its exercise is attended by the same incidents which attend the exercise of the police power of the states." (*Id.* at p. 114 [85 L.Ed. at p. 617]; cf. *Benanti* v. *United States* (1957) 355 U.S. 96, 104 [2 L.Ed.2d 126, 132, 78 S.Ct. 155].)

■ Unquestionably the conversation between Halpin and his wife was a wire communication within the meaning of section 2510(1) since it was carried over wires between Ontario and San Diego and operated by a common carrier engaged in interstate communications. Moreover, the conversation was intercepted within the meaning of section 2510(4)[20] and the interception was not authorized in accordance with section 2516. The contents of the conversation are therefore inadmissible. (§ 2515.)

Since we hold that title III has preempted particular fields of wiretapping and electronic surveillance, we need not reach the issue whether the Halpins' right of privacy was invaded by monitoring and tape recording the phone call.[21]

Let a peremptory writ of mandate issue directing the respondent superior court to suppress the evidence obtained in the execution of the search warrant and from the interception of petitioner's call to his wife from the telephone at the jail.

McComb, J., Peters, J., Tobriner, J., Burke, J., and Sullivan, J., concurred.

---

[20]Section 2510(4) provides: " 'intercept' means the aural acquisition of the contents of any wire or oral communication through the use of any electronic, mechanical, or other device." (See also Sen. Rep., *supra*, at p. 90.)

[21]The Attorney General maintains that persons in jail do not have a reasonable expectation of privacy. (See Pen. Code, §§ 851.5, 4570; *People* v. *Lopez* (1963) 60 Cal.2d 223 [32 Cal.Rptr. 424, 384 P.2d 16]; *In re Ferguson* (1961) 55 Cal.2d 663 [12 Cal.Rptr. 753, 361 P.2d 417]; *People* v. *Califano* (1970) 5 Cal.App.3d 476 [85 Cal.Rptr. 292]; *People* v. *Blair* (1969) 2 Cal.App.3d 249 [82 Cal.Rptr. 673]; *People* v. *Chandler* (1968) 262 Cal.App.2d 350 [68 Cal.Rptr. 643]; *People* v. *Miller* (1967) 252 Cal.App.2d 877 [60 Cal.Rptr. 791]; *People* v. *Apodaca* (1967) 252 Cal.App.2d 656 [60 Cal.Rptr. 782]; *People* v. *Hernandez* (1964) 229 Cal.App.2d 143 [40 Cal. Rptr. 100]; *People* v. *Morgan* (1961) 197 Cal.App.2d 90 [16 Cal.Rptr. 838]; *Davis* v. *Superior Court* (1959) 175 Cal.App.2d 8 [345 P.2d 513].) We leave unresolved the precise limitations on that rule. Moreover, we do not determine whether conversations made in this context may also be immune from interception because they are also privileged. (See 18 U.S.C. § 2517(4); Schwartz, *supra*, 67 Mich.L.Rev. 455, at pp. 466-468; Comment, *supra*, 57 Cal.L.Rev. 1182, at pp. 1228-1230.)

**MOSK, J.**—I concur.

I agree completely with the court's opinion on federal preemption of electronic surveillance. On the subject of the search warrant, however, I concur under compulsion of *People* v. *Hamilton* (1969) 71 Cal.2d 176 [77 Cal.Rptr. 785, 454 P.2d 681].

The admonition to magistrates on the improvident issuance of search warrants, and on the two-pronged requirements of *Aguilar* v. *Texas* (1964) 378 U.S. 108 [12 L.Ed.2d 723, 84 S.Ct. 1509], is well advised. With relatively simple effort and a minimum of cerebration, issuing judges can prevent the embarrassment that is theirs, and the potential injustice to society, when a faulty warrant prevents evidence from being introduced at a trial.

On the other hand, there are also two-pronged mitigating considerations for reviewing courts. First, the exigent circumstances under which search warrants are originally sought often preclude careful preparation and thoughtful consideration by the magistrate; the motor vehicle in transit here is a typical example of the necessity for haste. Second, the lay character of those who generally prepare affidavits for warrants suggests the documents will seldom be drafted with consummate legal skill.[1]

The manner in which warrants should be interpreted has divided courts from *Draper* v. *United States* (1959) 358 U.S. 307 [3 L.Ed.2d 327, 79 S.Ct. 329], through *Aguilar* and its progeny, down to *United States* v. *Harris* (1971) 403 U.S. 573 [29 L.Ed.2d 723, 91 S.Ct. 2075]. Often as a last refuge, reliance upon an illusory test of "common sense" has been employed in a wide variety of search and seizure contexts. For example, in *United States* v. *Ventresca* (1965) 380 U.S. 102, 109 [13 L.Ed.2d 684, 689, 85 S.Ct. 741], Justice Goldberg wrote that the affidavit should be "read in a commonsense way." In the same opinion he insisted that "affidavits for search warrants, such as the one involved here, must be tested and interpreted by magistrates and courts in a commonsense and realistic fashion." Justice Black, dissenting in *Katz* v. *United States* (1967) 389 U.S. 347, 366 [19 L.Ed.2d 576, 591, 88 S.Ct. 507], stated that "common sense requires . . . a liberal construction." Conflicting views in *Spinelli* v. *United States* (1969) 393 U.S. 410 [21 L.Ed.2d 637, 89 S.Ct. 584], invoked the same doctrine: Justice Harlan, for the majority, wrote, "[I]ssuing magistrates are not to be confined . . . by restrictions on the use of their common sense" (*id.* at p. 419 [21 L.Ed.2d at p. 645]); Justice Fortas, disagreeing in the same case, maintained that "a policeman's affidavit is entitled to common-sense evaluation." (*Id.* at p. 439 [21 L.Ed.2d at p. 657].)

---

[1]Here more expertise could have been expected, since a deputy district attorney personally appeared before the magistrate.

Justice Black, dissenting in *Vale* v. *Louisiana* (1970) 399 U.S. 30, 36 [26 L.Ed.2d 409, 415, 90 S.Ct. 1969], repeated his earlier opinion for the majority in *Preston* v. *United States* (1964) 376 U.S. 364 [11 L.Ed.2d 777, 84 S.Ct. 881], that "common sense dictates that reasonableness varies with the circumstances of the search." In *United States* v. *Harris, supra,* at page 583 [29 L.Ed.2d at p. 734], Chief Justice Burger wrote that "Common sense . . . would induce a prudent and disinterested observer to credit these statements." And even a majority of this court spoke of "a common-sense interpretation" in *People* v. *Superior Court (Johnson)* (1972) *ante,* pp. 704, 711 [100 Cal.Rptr. 319, 493 P.2d 1183].

Whatever may be the appropriate test, I have urged numerous times that this court must give law enforcement officers every encouragement to seek warrants, rather than to compel them to depend upon their hasty and competitive judgment in the field. (See my dissents in *People* v. *Scoma* (1969) 71 Cal.2d 332, 340 [78 Cal.Rptr. 491, 455 P.2d 419]; *People* v. *Hamilton, supra,* at p. 183; *People* v. *Sesslin* (1968) 68 Cal.2d 418, 431 [67 Cal.Rptr. 409, 439 P.2d 321].) An excessively restrictive interpretation of affidavits, or as the high court in *Ventresca, supra,* put it, a "grudging or negative attitude by reviewing courts toward warrants" will in the long run "tend to discourage police officers from submitting their evidence to a judicial officer before acting." (380 U.S. at p. 108 [13 L.Ed.2d at p. 689].)

It is of vital importance to society, to suspects, and for the protection of law enforcement officers themselves, that probable cause be determined by a "neutral and detached magistrate." (*Johnson* v. *United States* (1948) 333 U.S. 10, 14 [92 L.Ed. 436, 440, 68 S.Ct. 367].) To this end "it obviously is not desirable to place unnecessary burdens" upon the use of warrants. (*People* v. *Keener* (1961) 55 Cal.2d 714, 723 [12 Cal.Rptr. 859, 361 P.2d 587].)

Were it not for *Hamilton* and if we were writing on a clean slate, I would be inclined to treat the instant warrant—though certainly it is no model—somewhat more tolerantly, and to find it does not offend the Fourth Amendment, or article I, section 19, of the Constitution of California.

The petition of the real party in interest for a rehearing was denied May 23, 1972.