[No. A093862. First Dist., Div. Five. Oct. 18, 2002.]

THE PEOPLE, Plaintiff and Respondent, v.
TSHOMBE KELLEY, Defendant and Appellant.

**[Opinion certified for partial publication.\*]**

---

*Pursuant to California Rules of Court, rule 976(b)(1) and (3) the court orders publication of the introductory paragraph, Background, part III of the Discussion, and the Disposition.

**COUNSEL**

J. Bradley O'Connell, under appointment by the Court of Appeal, for Defendant and Appellant.

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Ronald A. Bass, Assistant Attorney General, Laurence K. Sullivan and Aileen Bunney, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**GEMELLO, J.**—Tshombe Kelley appeals his conviction for first degree murder and sentence of 52 years to life, raising a variety of issues. Only one has merit: we agree that the prosecution should not have been permitted to cross-examine Kelley concerning prior unproven crimes. However, because any error in this regard was harmless in light of the considerable evidence against Kelley, we affirm the judgment in its entirety.[1]

### BACKGROUND

On May 21, 2000, at 6:31 p.m., a 911 operator received a call that a man had been shot in the 4100 block of Mera Avenue in Oakland. The call came from Kelley's next-door neighbors, who heard shots coming from Kelley's house at 4126 Mera. While the husband was on the phone, the wife saw the victim, Aaron Stewart, stooped over, walking up to a neighbor's porch. She went out to Stewart. He was unable to respond to questions. He died from multiple gunshot wounds in the back. The neighbors saw no one else in the area.

Another neighbor heard shots. She awakened the father of her children. He saw Stewart slumped outside their house, went outside, and saw Kelley outside in his yard. When he asked what happened, Kelley replied, "Dude tried to rob me. Give dude back his keys," and held out a set of keys.

Police arrived within two minutes. A few minutes later, an officer saw Kelley, sweating, through the screen door of Kelley's house. When the officer asked Kelley to talk to him, Kelley began to shake and announced, "I didn't shoot anybody."

Forensics tests found blood inside Kelley's gate. The blood was consistent with Stewart's. A bullet hole in the gate indicated that a shot had been fired from Kelley's doorway or porch. Kelley's right hand tested positive for gunshot residue, though in a quantity insufficient to establish that he had recently fired a gun. Neither the murder weapon nor any spent shells were found.

---

[1]Kelley has also filed a petition for writ of habeas corpus (case No. A097711) related to this appeal. By separate order filed on this same date, we deny the petition.

The three adults at 4126 Mera were Kelley, his girlfriend Corrie Tridente, and Tridente's cousin, Cassandra Bugnatto. They were detained and questioned separately. Bugnatto, who was away at a laundromat during the shooting, said that Stewart and Kelley had had a falling-out over an affair between Tridente and Stewart. After initially denying that she knew Stewart, Tridente admitted that she had had an affair with Stewart. She said that when Stewart came by, Kelley got a gun and went out to meet him. She heard yelling and then gunshots. Kelley refused to speak with police without an attorney present. Early on the morning of the 22d, he was charged with murder.

In September 2000, shortly before trial, the prosecution asked for Kelley's outbound calls from prison to be taped. Based on these tapes, the prosecution obtained a search warrant for Kelley's prison cell and Tridente's residence, which at the time of trial was her grandmother's home. The search yielded numerous letters between Kelley, Tridente, and others that formed a central part of the prosecution's case. In these letters, Kelley coached Tridente on what actions and testimony would be favorable and suggested testimony for Bugnatto. In an October 3 letter, he asked Tridente to refuse to testify, notwithstanding any court order, in the hope of suppressing her May 21 taped statements.

At trial, the prosecution introduced testimony from numerous witnesses that Tridente and Stewart had had an affair in 1999, and that Kelley threatened to harm or kill Stewart as a result. Stewart and Kelley were one-time friends; at some point after the affair, they partially reconciled.

In the spring of 2000, Kelley bought a car from Stewart. When it broke down shortly thereafter, Kelley held off on paying Stewart. In late April, according to prosecution witnesses, Kelley went to Stewart's house, argued with Stewart, fired a gun in the air, and left. Kelley returned that day and aimed a gun at Stewart; according to some witnesses, the gun jammed, while according to another, it was not loaded and Kelley was just trying to scare Stewart. Kelley made further threats on Stewart's life.

On May 21, the day of the shooting, Bugnatto, a friend of both Stewart and Kelley, was babysitting Stewart's son at Kelley's house. Another mutual friend of Stewart and Kelley who was with Stewart that day, David Maldonado, testified that Stewart received a call to come pick up his son from Kelley's apartment. Stewart used Maldonado's car. Maldonado called Kelley immediately after Stewart left. Kelley asked whether Maldonado was with Stewart; Maldonado said no, implying that Stewart was coming alone.

Tridente was unwilling to testify and did so only after the court granted her immunity and ordered her to testify. She repudiated her May 21 statements.

Kelley testified in his own defense. He denied that he shot Stewart. Though he knew about the affair, he denied any lasting problems with Stewart. On the evening of the shooting, he and Tridente were at home when they heard shots. Kelley saw what looked like a White male go past his window. He went outside, recognized Maldonado's car, and thought that someone must have tried to rob Maldonado. He said to his neighbor, not "Dude tried to rob me," but "Someone tried to rob him." Only later, when he saw the body being taken away, did he realize that it was Stewart who had been shot.

A jury convicted Kelley of first degree murder (Pen. Code, § 187) and personal use of a firearm resulting in great bodily injury or death (Pen. Code, § 12022.53, subds. (c) & (d)), based on the Stewart shooting, as well as willfully discharging a firearm in a grossly negligent manner (Pen. Code, § 246.3), based on the late April incident where Kelley fired a gun in the air at Stewart's house. The court sentenced Kelley to 52 years to life.

Kelley has timely appealed.

## DISCUSSION

### I., II.*

.  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .

### III. *The Prosecution's Wiretap of Kelley's Jailhouse Conversations Was Legal*

■ The prosecution recorded Kelley's jailhouse telephone conversations and introduced portions of the transcripts, as well as evidence seized based on those conversations. Kelley challenges the wiretap under title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 United States Code section 2510 et seq. (Title III) and state law. We review these issues de novo. (*U.S. v. Van Poyck* (9th Cir. 1996) 77 F.3d 285, 291.) We find no violation of either federal or state law.

■ With certain limited exceptions, Title III prohibits the unauthorized interception of "any wire, oral, or electronic communication." (18 U.S.C. § 2511(1)(a).) Thus, "[i]t protects an individual from all forms of wiretapping except when the statute specifically provides otherwise." (*Abraham v. County of Greenville, S.C.* (4th Cir. 2001) 237 F.3d 386, 389.) Those protections apply to prisoners and prison monitoring. (See, e.g., *U.S. v. Amen*

---

*See footnote, *ante*, page 853.

(2d Cir. 1987) 831 F.2d 373, 378.) ▮▮▮ Therefore, the recordings of Kelley were obtained legally only if one of the statutory exceptions to the prohibition applies. The People argue that two of the specified exceptions, the consent and law enforcement exceptions, render its use of the recordings proper in this case. Because we agree that the consent exception applies, we need not address the law enforcement exception.

Under Title III, "[i]t shall not be unlawful . . . for a person acting under color of law to intercept a wire, oral, or electronic communication, where . . . one of the parties to the communication has given prior consent to such interception." (18 U.S.C. § 2511(2)(c).) "The legislative history of [Title III] shows that Congress intended the consent requirement to be construed broadly." (*U.S. v. Amen, supra,* 831 F.2d at p. 378; see Sen.Rep. No. 1097, 90th Cong., 2d Sess. (1968), reprinted in 1968 U.S. Code Cong. & Admin. News, pp. 2112, 2182.) Consistent with this intent, every federal circuit court to address the question has concluded that a prisoner who, while on notice that his telephone conversation is subject to taping, proceeds with the conversation, has given implied consent to that taping. (*U.S. v. Footman* (1st Cir. 2000) 215 F.3d 145, 155; *U.S. v. Workman* (2d Cir. 1996) 80 F.3d 688, 693-694; *U.S. v. Horr* (8th Cir. 1992) 963 F.2d 1124, 1125-1126; *U.S. v. Van Poyck, supra,* 77 F.3d at p. 292; but see *U.S. v. Daniels* (7th Cir. 1990) 902 F.2d 1238, 1244-1245 [criticizing other courts' broad views of consent but deciding case on another ground].)

Our Supreme Court's recent decision in *People v. Loyd* (2002) 27 Cal.4th 997 [119 Cal.Rptr.2d 360, 45 P.3d 296] demonstrates that at least two members of that court would agree with the views of these federal courts. While the majority found it unnecessary to reach the issue, Justice Moreno, joined by Justice Kennard, spelled out his agreement with the consensus interpretation of the circumstances sufficient to find implied consent by prisoners. (*Id.* at pp. 1014-1015 (conc. opn. of Moreno, J.).) We agree as well. So long as a prisoner is given meaningful notice that his telephone calls over prison phones are subject to monitoring, his decision to engage in conversations over those phones constitutes implied consent to that monitoring and takes any wiretap outside the prohibitions of Title III.

Kelley relies on two passages from earlier California Supreme Court decisions to argue that that court would take a different view of Title III than the federal courts. (*People v. Otto* (1992) 2 Cal.4th 1088, 1098-1099, fn. 7 [9 Cal.Rptr.2d 596, 831 P.2d 1178]; *Halpin v. Superior Court* (1972) 6 Cal.3d 885, 900, fn. 21 [101 Cal.Rptr. 375, 495 P.2d 1295].) *Otto* and *Halpin* each suggest in footnotes that the protections of Title III apply even if a telephone caller has no reasonable expectation of privacy. While this may be so, it has

little bearing on our inquiry. The issue is not whether Kelley's calls were within the ambit of Title III as an initial matter; both sides agree that they were. Instead, the issue is whether any of the limited exceptions spelled out in Title III remove those calls from Title III's protections. On that point, *Otto* and *Halpin* are not instructive. We rely instead on *Loyd* and the developed federal consensus on the scope of the consent exception.

That consent exception applies here. Kelley's housing unit had a warning sign above its telephones, which stated, "Telephone calls may be monitored and recorded." In addition, the prison phone system contained a warning at the beginning of each call stating that all calls were subject to monitoring or recording. Meaningful notice includes "a monitoring notice posted by the outbound telephone, or a recorded warning that is heard by the inmate through the telephone receiver, prior to his or her making the outbound telephone call." (*People v. Loyd, supra,* 27 Cal.4th at p. 1015 (conc. opn. of Moreno, J.).) Such notice is precisely the sort of notice previously found sufficient to hold that a prisoner has impliedly consented to monitoring. (See *U.S. v. Amen, supra,* 831 F.2d at p. 379; *U.S. v. Workman, supra,* 80 F.3d at p. 693; *U.S. v. Van Poyck, supra,* 77 F.3d at p. 292; *U.S. v. Horr, supra,* 963 F.2d at p. 1126.) Because Kelley had notice that his calls were subject to monitoring, he consented when he used the prison's phone system.

It is true that this rule presents prisoners with "a choice between unattractive options," limiting their contact with the outside world or submitting to government eavesdropping. (*Langton v. Hogan* (1st Cir. 1995) 71 F.3d 930, 936.) However, there is no reason to believe Congress intended to draw the statute so narrowly as to exclude such prisoner choices from the notion of consent. (*U.S. v. Footman, supra,* 215 F.3d at p. 155.) The use of prison telephones is a privilege, not a right.

With respect to state law, our Supreme Court recently held that a prosecutor does not commit misconduct when he seeks the surreptitious recording of conversations between an imprisoned defendant and third parties, as the deputy district attorney did here. (*People v. Loyd, supra,* 27 Cal.4th 997.) Twenty years earlier, the same court held that such actions constituted misconduct. (*De Lancie v. Superior Court* (1982) 31 Cal.3d 865 [183 Cal.Rptr. 866, 647 P.2d 142].) However, *Loyd* concluded that intervening statutory amendments have abrogated *De Lancie.* (*Loyd, supra,* 27 Cal.4th at p. 1010.)

Kelley concedes that *Loyd* disposes of his state law challenge to the wiretapping based on *De Lancie.* However, he raises a second state law challenge based on Penal Code section 629.50. We find no violation of that

statute either. Section 629.50 governs applications for judicial approval of wiretapping. No such approval was required here. California's wiretapping statutes, like Title III, do not apply to the monitoring and recording of conversations where one party consents. (Pen. Code, § 631, subd. (a) [prohibiting only "unauthorized" wiretap]; *People v. Canard* (1967) 257 Cal.App.2d 444, 463-464 [65 Cal.Rptr. 15].) Because Kelley consented to have his conversations monitored, the deputy district attorney did not need to seek judicial approval, and section 629.50 is inapplicable. The admission of tapes of Kelley's conversations, as well as the fruits of those tapes, was proper.

IV. *The Prosecution's Questioning About Unproven Prior Crimes Was Harmless Beyond a Reasonable Doubt in Light of All the Evidence**

.  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .

DISPOSITION

The judgment is affirmed.

Jones, P. J., and Stevens, J., concurred.

A petition for a rehearing was denied November 18, 2002, and appellant's petition for review by the Supreme Court was denied January 22, 2003.

---

*See footnote, *ante*, page 853.