No. 47,839

STATE OF KANSAS, *Appellant*, v. HAL FARHA, GERALD FARHA, PHIL RAZOOK, JAMIE THOMPSON, JOHN D. KNIGHTLEY, JR., GRANT PARSONS, PETE CHRISTOPHER, and HERBERT COHLMIA, *Appellees*.

STATE OF KANSAS, *Appellant*, v. JOAN SOLLS, RUSSELL ADAMS and FREDERICK MELZER, *Appellees*.

(544 P. 2d 341)

Opinion filed December 13, 1975.

*Keith Sanborn,* district attorney, argued the cause, and *Curt T. Schneider,* attorney general, and *Robert Kennedy, Jr.,* assistant district attorney, were with him on the brief for the appellant.

*Jack Focht,* of Smith, Shay, Farmer and Wetta, of Wichita, argued the cause, and *Harold Irwin,* of Wichita, was with him on the brief for appellees Hal Farha, Gerald Farha and Phil Razook.

*Stephen Jones,* of Hershberger, Patterson, Jones and Roth, of Wichita, argued the cause, and *William L. Oliver, Jr.,* of Martin, Pringle, Schell and Fair, of Wichita, was with him on the brief for appellees John D. Knightley, Jr. and Jamie Thompson.

*F. C. McMaster*, of McMaster and Smith, of Wichita, argued the cause and was on the brief for appellee Joan Solls.

*Everett C. Fettis*, of Fettis, Quinn and Beasley, of Wichita, was on the brief for appellees Grant Parsons and Russell Adams.

*Harry L. Najim*, of Wichita, entered his appearance for appellee Herbert Cohlmia.

The opinion of the court was delivered by

HARMAN, C.: This interlocutory appeal by the state seeks to vacate an order suppressing evidence obtained by electronic search warrants. Defendants in the case are charged with numerous counts of commercial gambling (K. S. A. 21-4304) and conspiracy to commit commercial gambling (K. S. A. 21-3302).

All but one of the electronic search warrants were issued pursuant to K. S. A. 1971 Supp. 22-2513 (repealed and superseded effective July 1, 1974). The defendants contended this statute was unconstitutional on its face and also invalid because it did not comply with standards for electronic surveillance established by federal statutes. The trial court agreed. It further ruled that the evidence obtained in the last warrant, issued pursuant to our present statutes on electronic surveillance and whose validity has not been challenged, was "fatally tainted" by the prior illegally obtained evidence and must also be suppressed. In all, five electronic search warrants and three extension orders were issued between October 24, 1972, and July 2, 1974. Pertinent facts may be stated in three chronological groups: (1) Warrants obtained in Shawnee county pursuant to our former statute; (2) those obtained in Sedgwick county pursuant to the same law; and (3) one obtained in Sedgwick county pursuant to our present law (K. S. A. 22-2514 to 22-2519 [Weeks 1974]).

1. Shawnee county warrants—K. S. A. 1971 Supp. 22-2513

In October, 1972, Mr. Patrick Connolly, assistant attorney general in charge of the criminal division of the Kansas attorney general's office, received information from two special agents of the Kansas bureau of investigation concerning commercial gambling activities (bookmaking on sporting events) of defendant Hal Farha in Wichita. A confidential informant, who had given reliable information in the past, had placed bets with Mr. Farha by telephone in the presence of a KBI agent, which were tape recorded with the consent of the informant. As revealed by an affidavit dated March 21, 1975, Mr. Connolly outlined to the then attorney general the evidence

developed in the investigation and received his authorization to apply for an electronic search warrant to tap Mr. Farha's telephone lines. Mr. Connolly then prepared an application and on October 24, 1972, presented it to the Honorable Adrian J. Allen, judge of division No. 4 of the Shawnee county district court.

Two KBI agents, who had actively participated in the investigation, testified and a recorded wagering transaction with defendant Hal Farha was played for the court. The court found that probable cause existed to issue the warrant. The order for an electronic search warrant was for a period of ten days. On November 2, 1972, again after reviewing information obtained with the attorney general and receiving his authorization, Mr. Connolly applied to Judge Allen for two orders. One application was for an extension of the October 24th order and also for authority to intercept an additional telephone number obtained under the first wiretap order. The other was for authorization to intercept and record conversations on telephone numbers belonging to defendant Gerald Farha. The court examined witnesses regarding the progress of the interceptions and results obtained, found that probable cause existed for an extension of the original order and the addition of new numbers and also for the interception and recording of Gerald Farha's communications. Both orders were for a ten day period.

As a result of evidence secured from these interceptions search warrants were issued under which searches and arrests were made on December 1 and 2, 1972, at the defendants Farhas' business establishments in Wichita. Physical evidence was seized, witnesses were interviewed and commercial gambling and conspiracy informations were filed against the two Farhas on December 1, 1972. Inventories of intercepted materials were filed with the court on December 20, 1972, and served on the Farhas at that time. No other notices of intercepted conversations were ever filed or served upon any other parties to this action nor was any request for determination of persons who should be served with inventories ever made to the district court of Shawnee county or of Sedgwick county.

2. Sedgwick county warrants—K. S. A. 1971 Supp. 22-2513

Independently of the foregoing, in October, 1973, Mr. Reese Jones, assistant district attorney of Sedgwick county, received an anonymous phone call informing him that defendant Joan Solls was taking bets and that a bet could be placed with her by calling one of two named telephone numbers and by stating that the caller had been referred by a certain named person. In addition, Detective

Beverly Artman of the Wichita police department received a call informing him of the bookmaking activities of defendant Frederick "Mo" Melzer and his "partner" Joan Solls. Detective Artman and certain KBI agents then conducted extensive physical surveillance of both Solls and Melzer and observed several suspected gambling transactions. Details of this investigation were discussed with Mr. Keith Sanborn, district attorney of Sedgwick county, and on December 13, 1973, he made application to the Honorable David P. Calvert, judge of division No. 9 of the district court of Sedgwick county, for an electronic search warrant for the telephones of Joan Solls, used by her and defendant Melzer. After examining sworn witnesses and the district attorney's verified application the court found there was probable cause to issue the warrant, no other means were available to obtain the evidence sought, that probable cause established that a continuing crime was being committed. A warrant was issued and the court ordered that the surveillance not be terminated when the first conversation was seized.

This warrant produced evidence of commercial gambling and conspiracy to commit that crime. A ten day extension of it was sought and granted on December 19, 1973, after another evidentiary hearing held before Judge Calvert. Interceptions under the December 13th order and its extension disclosed gambling activities on the part of Solls and Melzer and of defendant Russell Adams.

On January 9, 1974, the district attorney made an application to Judge Calvert for an electronic search warrant for communications of defendant Adams. After an evidentiary hearing a warrant was issued. On January 19, 1974, Judge Calvert extended this order for a ten day period.

3. Sedgwick county warrant—K. S. A. 22-2514 to 22-2519 (Weeks 1974)

In June, 1974, an FBI agent observed a man, identified to him as Phil Razook, engaged in bookmaking activities at a private club in Wichita. He informed another FBI agent of this and the latter in turn observed Razook making and transmitting bets over a pay phone at the club. Detective Artman and two other police officers, through numerous observations, were able to ascertain that the numbers Razook was calling were listed to defendant Hal Farha. Their physical surveillance also revealed that Razook met often with Farha and Melzer. Armed with this and other information mentioned later, Mr. Sanborn on July 2, 1974, made applica-

tion to Judge Calvert for an electronic search warrant against the defendants Razook, Melzer and Hal Farha. (Meanwhile, on July 1, a new Kansas statute governing electronic surveillance, now K. S. A. 22-2514 to 22-2519 [Weeks 1974] became effective. It repealed and superseded 22-2513 and essentially follows the provisions of Title III of the Omnibus Crime Control and Safe Streets Act of 1968 [U. S. C. §§ 2510-2520].) After an evidentiary hearing Judge Calvert found probable cause and issued the requested order.

More evidence was gathered pursuant to this order and on September 12, 1974, the Sedgwick county district attorney filed informations against all defendants, alleging offenses of commercial gambling and a continuing conspiracy to commit gambling. Thereafter defendants moved to suppress all evidence obtained from the electronic search warrants. On February 20, 1975, the Honorable Nicholas W. Klein, judge of division No. 8 of the Sedgwick county district court, ruled that K. S. A. 1971 Supp. 22-2513 was constitutionally invalid, was deficient also because it did not comply with the procedures required by federal statute and purported to give state officials (assistant attorneys general) broader authority in seeking an electronic search warrant than was permissible under 18 U. S. C. § 2510, et seq. The court suppressed the evidence obtained under all the warrants issued before July 1, 1974. It further found that the July 2, 1974, warrant issued pursuant to our present state statutes (K. S. A. 22-2514, et seq. [Weeks 1974]) was "fatally tainted" by the illegally obtained evidence under the prior warrants. The court suppressed all the evidence derived from the July 2d intercept and it held that the testimony of witnesses endorsed on the informations filed September 12, 1974, should also be suppressed, subject to establishment by the state that the testimony of any particular witness was not tainted by the defective intercepts. In its suppression order the court found that all defendants were "aggrieved parties" pursuant to the provisions of 18 U. S. C. § 2510, et seq. This appeal by the state ensued.

We should first examine the legal background and history of wiretapping or, as it has sometimes been called, "eavesdropping". The fourth amendment to the federal constitution provides:

"The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

This proviso embodies one of our most cherished freedoms—the security of one's privacy against arbitrary police intrusion. Unreasonable searches and seizures are forbidden. In 1928, in *Olmstead v. United States,* 277 U. S. 438, 72 L. ed. 944, 48 S. Ct. 564, the federal supreme court held that wiretapping did not constitute a search within the meaning of the fourth amendment. Over the course of the years and the development of electronic eavesdropping technology so sophisticated and pervasive that a person's conversation under virtually any circumstances can be monitored, this viewpoint changed, doubtless prompted by the indiscriminate use of these awesome devices. In 1967 in *Berger v. New York,* 388 U. S. 41, 18 L. ed. 2d 1040, 87 S. Ct. 1873, and *Katz v. United States,* 389 U. S. 347, 19 L. ed. 2d 576, 88 S. Ct. 507, the supreme court abandoned the "physical intrusion" doctrine that formed the basis of the *Olmstead* decision and concluded that the fourth amendment protects people, and not simply places, against unreasonable searches and seizures.

In *Berger* a New York statute was held unconstitutional, for a number of reasons, as authorizing general searches by electronic devices. The court did not rule that all electronic surveillance violated the fourth amendment. Electronic surveillance could be conducted if it was done " 'under the most precise and discriminate circumstances, circumstances which fully met the "requirement of particularity" ' of the Fourth Amendment". (388 U. S. at p. 56.) In *Katz* the court stressed the necessity of a showing of probable cause before an independent judicial officer before electronic surveillance could be conducted.

Responding to these decisions, and seeking to provide the judicial procedures and controls found lacking, Congress enacted Title III of the Omnibus Crime Control and Safe Streets Act of 1968, codified in 18 U. S. C. §§ 2510-2520. Legislative history on the subject tells us:

"Title III has as its dual purpose (1) protecting the privacy of wire and oral communications, and (2) delineating on a uniform basis the circumstances and conditions under which the interception of wire and oral communications may be authorized. To assure the privacy of oral and wire communications, title III prohibits all wiretapping and electronic surveillance by persons other than duly authorized law enforcement officers engaged in the investigation or prevention of specified types of serious crimes, and only after authorization of a court order obtained after a showing and finding of probable cause." (1968 U. S. Code Cong. and Admin. News, S. Rep. 1097, 90th Congress, 2d Session, pp. 2112, 2153, [referred to hereafter as S. Rep.].)

Federal courts of appeal in all the circuits but one have now considered Title III and have held it constitutional.

Although Congress in enacting Title III preempted the field of electronic surveillance regulation under its power to regulate interstate communications, it did at the same time allow for concurrent state regulation subject, at the minimum, to the requirements of the federal regulation (U. S. C. § 2516 [2]). This statement of congressional intent with respect to wiretap standards provided by the states was made:

". . . The State statute must meet the minimum standards reflected as a whole in the proposed chapter. The proposed provision envisions that States would be free to adopt more restrictive legislation, or no legislation at all, but not less restrictive legislation. State legislation enacted in conformity with this chapter should specifically designate the principal prosecuting attorneys empowered to authorize interceptions. The State judge of competent jurisdiction . . . empowered by the State legislation to grant orders for interceptions would have to make the findings which would be the substantial equivalent to those required by section 2518(3) . . . and the authorization itself would have to be made in substantial conformity with the standards set out in section 2518. . . ." (S. Rep. 2187.)

Several principles emerge from decisions interpreting 18 U. S. C. § 2516 (2) providing for state regulation of electronic surveillance. First, the federal act is not self-executing on the states; in order to obtain a wiretap warrant from a state court there must be a state wiretap statute in effect (*State v. Siegel*, 266 Md. 256, 292 A. 2d 86; *Halpin v. Superior Court*, 6 Cal. 3d 885, 101 Cal. Rptr. 375, 495 P. 2d 1295, cert. den. 409 U. S. 982, 34 L. ed. 2d 246, 93 S. Ct. 318).

Second, although a state may adopt a statute with standards more stringent than the requirements of the federal law (*Alderman v. United States*, 394 U. S. 165, 22 L. ed. 2d 176, 89 S. Ct. 961; *Cooper v. California*, 386 U. S. 58, 17 L. ed. 2d 730, 87 S. Ct. 788), a state may not adopt a statute with standards more permissive than those set forth in Title III (*In re Olander*, 213 Kan. 282, 515 P. 2d 1211). "A State statute would be preempted where the State law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress" (*Commonwealth v. Vitello, Mass.*, 327 N. E. 2d 819, 835). If a state wiretap statute is more permissive than the federal act, any wiretap authorized thereunder is fatally defective and the evidence thereby obtained is inadmissible under 18 U. S. C. § 2515.

Broadly stated, the issues on appeal here with respect to all but the last of the wiretaps are whether K. S. A. 1971 Supp. 22-2513 was

on its face violative of the fourth amendment to the federal constitution and also deficient in its conformance to the mandate of 18 U. S. C. §§ 2510-2520. Necessarily there is overlapping in these considerations because the procedure set out in the federal statutes embodies the constitutional requirements established in *Berger v. New York,* supra.

We look first at the wiretaps authorized by the Shawnee county district court, secured upon application of an assistant attorney general. K. S. A. 1971 Supp. 22-2513 provided:

"*Order authorizing eavesdropping.* An *ex parte* order authorizing eavesdropping, as defined in K. S. A. 1969 Supp. 21-4001, may be issued by any justice of the supreme court or by any district judge as herein provided.

"(1) The attorney general, an assistant attorney general or a county attorney may make an application to any of the above specified magistrates for an order authoriz*ed* easesdropping when the information to be obtained may provide evidence of the commission of any of the following offenses:

. . . . . . . . . . . .

"(g) Commercial gambling;

. . . . . . . . . . . .

"The application for the order shall be in writing, shall be under oath and shall particularly describe the crime or crimes under investigation and the person or persons whose conduct is to be observed or whose communications or conversations are to be overheard or recorded, and, in the case of a telephonic or telegraphic communication, shall identify the particular telephone number or telegraph line involved.

"(2) The magistrate to whom application for an order authorizing eavesdropping is addressed shall examine, under oath, the applicant and any other witness he may produce and shall satisfy himself that there are reasonable grounds and probable cause therefor before granting such application and that there are no other means available for obtaining the evidence and that the evidence to be obtained is essential to the solution or prevention of the crime or may assist in the prosecution thereof. All testimony given on such examination shall be reduced to writing.· The order shall be directed to any law enforcement officer of the state of Kansas. It shall state the ground for its issuance, and shall particularly describe the premises to be entered upon, the person or persons to be observed or whose communications or conversations are to be intercepted, the crime or crimes under investigation and the telephone number or telegraph line involved.

"(3) The order authorizing eavesdropping shall specify the period during which it shall be effective, but in no case shall the said effective period continue more than ten days from the date of issuance unless extended or renewed by the magistrate who signed and issued the original order upon satisfying himself that the facts which justified the issuance of the original order continue to exist and that such extension or renewal is in the public interest.

"(4) Within three (3) days after the expiration of the order, the officer executing the order shall endorse thereon a statement of any action taken pursuant thereto and shall return the same to the magistrate by whom it was

issued. If photographs have been taken or sound recordings made pursuant to said order, the return shall so state, and, in the event of the prosecution of any person who has been the subject of eavesdropping, copies and transcripts of such photographs and sound recordings shall be made available to the defendant upon application to the court before whom the prosecution is pending."

First, the trial court ruled that K. S. A. 1971 Supp. 22-2513 (1) was unlawful because it purported to grant authority to an assistant attorney general to make application for a wiretapping order. Defendant-appellees contend this is an improper delegation of authority in that it conflicts with 18 U. S. C. § 2516 (2), the federal proviso for state-initiated wiretaps. That section in pertinent part states:

"The principal prosecuting attorney of any State, or the principal prosecuting attorney of any political subdivision thereof, if such attorney is authorized by a statute of that State . . . may apply . . . for . . . an order authorizing, or approving the interception of wire or oral communications. . . ." (p. 4385.)

Title III and its legislative history make clear the purpose of the authorization requirement:

". . . Congress was well aware of the grave threat to the privacy of every American that is posed by modern techniques of electronic surveillance [citing S. Rep. 1097]. While recognizing the importance of wiretapping in combating organized crime . . ., Congress was concerned lest overzealous law enforcement officers rely excessively upon such techniques in lieu of less intrusive investigative procedures." (*United States v. King*, 478 F. 2d 494, 503.)

Therefore, Congress enacted elaborate procedural requirements for the initiation of wiretaps. Crucial to these safeguards is that each wiretap application, before it is presented to the court, be authorized by a "publicly responsible official subject to the political process". (S. Rep. 2185.) This kind of centralization insures that wiretap applications not be approved routinely by lower echelon officials and further, if abuses in the practice develop, the responsibility for those abuses would point to an identifiable person. (*United States v. Giordano*, 416 U. S. 505, 40 L. ed. 2d 341, 94 S. Ct. 1820.)

In *In re Olander*, supra, we were concerned with the delegation by a county attorney to an assistant county attorney of the authority to apply for an eavesdropping order. In denying this right we commented:

"No area of the law is more sensitive than that of electronic surveillance, since such activity intrudes into the very heart of personal privacy. Thus it is that legislative assemblies, including the Congress, have carefully restricted the

right to apply for the use of electronic bugging devices to a very select coterie of public officers. Federal magistrates are fond of citing language excerpted from Senate Report No. 1097, 1968 U. S. Code Cong. & Admin. News, p. 2185, in explaining the legislative thinking which has undergirded the surveillance provisions of Title III of the Omnibus Crime Control and Safe Streets Act of 1968. (18 U. S. C. A. § 2510 *et seq.*) As to § 2516 (1), which pertains to the issuance of federal orders on application of highly placed government officials, the Senate Report reads:

" '. . . This provision centralizes in a publicly responsible official subject to the political process the formulation of law enforcement policy on the use of electronic surveillance techniques. Centralization will avoid the possibility that divergent practices might develop. Should abuses occur, the lines of responsibility lead to an identifiable person. This provision in itself should go a long way toward guaranteeing that no abuses will happen.' " (p. 285.)

These authorization requirements are not mere technicalities; they are at the heart of the congressional scheme. Their purpose is not just to protect the rights of defendants, but also those of the general public from abuse of the awesome power of electronic surveillance (*United States v. King,* supra, p. 505). The procedures outlined in 18 U. S. C. § 2516 must be strictly complied with by law enforcement officers (*United States v. Narducci,* 341 F. Supp. 1107; *In re Olander,* supra).

Appellant contends it was only necessary for the attorney general to *authorize* an application for a wiretap order; that in this case the attorney general did authorize and approve the application, and that should be sufficient even though the assistant attorney general made the application. The difficulty with this contention is that under 18 U. S. C. § 2516 (2) only the attorney general (the principal prosecuting attorney of the state) is authorized to make the application. The statute makes no distinction between "authorizing" and "applying". Keeping in mind the expressed objectives of Title III—to centralize in a publicly responsible official subject to the political process the formation of policy on electronic surveillance—we think no such distinction should be made. In Kansas the attorney general can appoint as many assistant attorneys general as he may deem necessary (K. S. A. 75-3111). We cannot perceive Congress intended that at any given time the number of persons in Kansas who may obtain a wiretap order is limited only by the number of assistant attorneys general and county attorneys in existence at the particular time. It is true the record on appeal contains an affidavit dated March 21, 1975, indicating prior review and approval of the Shawnee county application by the attorney general. In *In re*

*Olander,* supra, we declined to consider like evidence offered to shore up a county attorney's delegation power. Without in any way impugning the integrity of the affidavit in the case at bar we do not think delegation of state authority to apply for wiretaps in this fashion comports with congressional intent. Strictly circumscribing this authority to that stated in the federal act—in Kansas the attorney general—will clearly eliminate any possible after-the-fact question as to identifiable individual responsibility for the application. Inasmuch as K. S. A. 1971 Supp. 22-2513 (1) was more permissive than 18 U. S. C. § 2516 (2) in that it purported to authorize an assistant attorney general to make application for a wiretap order, our state statute must be held invalid as in conflict with the federal act. This means the trial court correctly ruled the Shawnee county wiretaps were illegally obtained.

In considering the validity of the electronic search warrants issued in Sedgwick county we should take further note of the constitutional standards for electronic surveillance outlined in *Berger v. New York,* supra. There the federal supreme court held that the New York statute was too broad to be constitutionally permissible in five respects. First, ". . . eavesdropping is authorized without requiring belief that any particular offense has been or is being committed; nor that the 'property' sought, the conversations, be particularly described". (pp. 58-59.) The New York statute provided for a wiretap order ". . . particularly describing the person or persons whose communications, conversations or discussions are to be overheard or recorded and the purpose thereof. . . ." (p. 43, footnote 1.) K. S. A. 1971 Supp. 22-2513, in essentially the same language, provided that:

"The application for the order shall be in writing, shall be under oath and shall particularly describe the crime or crimes under investigation and the person or persons whose conduct is to be observed or whose communications or conversations are to be overheard or recorded. . . ."

Although our statute provided that the applicant for a wiretap order state the crimes under investigation, this did not mean that the applicant must state his belief that any particular crime has been or is being committed. It would appear the New York and the Kansas statute suffered the same constitutional infirmity pointed out in *Berger*:

". . . It is true that the statute requires the naming of 'the person or persons whose communications, conversations or discussions are to be overheard or recorded. . . .' But this does no more than identify the person whose

constitutionally protected area is to be invaded rather than 'particularly describing' the communications, conversations or discussions to be seized. As with general warrants this leaves too much to the discretion of the officer executing the order." (p. 59.)

Second, the court found that the New York statute authorized eavesdropping for a two-month period, which amounted to ". . . a series of intrusions, searches, and seizures pursuant to a single showing of probable cause." (p. 59.) Prompt execution of the warrant was also not required by the New York statute. Our statute did limit the interception period to ten days but contained no provision that the order terminate when the first relevant conversation was seized, unless a special showing for a longer period was demonstrated. Even though the authorization period in Kansas was shorter than in New York, it still granted law enforcement officials an unlimited right to seize any and all conversations within that period, even if they were not relevant to any investigation, a practice specifically condemned in *Berger*.

Third, the court said that the New York statute permitted ". . . extensions of the original two-month period—presumably for two months each—on a mere showing that such extension is 'in the public interest'". (p. 59.) The New York statute provided that the eavesdrop order would terminate after two months ". . . unless extended or renewed by the justice or judge who signed and issued the original order upon satisfying himself that such extension or renewal is in the public interest." (p. 43, footnote 1.) The Kansas statute provided that the order would terminate after ten days: ". . . unless extended or renewed by the magistrate who signed and issued the original order upon satisfying himself that the facts which justified the issuance of the original order continue to exist and that such extension or renewal is in the public interest." With reference to the additional language in our statute about the requirement that the facts which justified the original order should continue to exist, *Berger* stated: ". . . Apparently the original grounds on which the eavesdrop order was initially issued also form the basis of the renewal. This we believe insufficient without a showing of present probable cause for the continuance of the eavesdrop." (p. 59.) Therefore, the requirements in the Kansas statute for an extension of an eavesdrop order were found unconstitutional in *Berger*, in that they did not require a present showing of probable cause to justify the extension order.

Fourth, *Berger* found that the New York statute ". . . places

no termination date on the eavesdrop once the conversation sought is seized. This is left entirely in the discretion of the officer". (pp. 59-60.) Similarly, our statute authorized a general search which continued over the entire period of the order. This type of general search is in direct conflict with the fourth amendment.

"Finally, the [New York] statute's procedure, necessarily because its success depends on secrecy, has no requirement for notice as do conventional warrants, nor does it overcome this defect by requiring some showing of special facts. . . ." (p. 60.) K. S. A. 1971 Supp. 22-2513 required a return be filed with the court three days after the intercept order expired, but it made no requirement that notice of the interception be given the person whose phone was tapped, nor that special facts be shown to obviate the notice requirement. As the court said in *Berger*: ". . . [This] permits unconsented entry without any showing of exigent circumstances. Such a showing of exigency, in order to avoid notice, would appear more important in eavesdropping, with its inherent dangers, than that required when conventional procedures of search and seizure are utilized". (p. 60.)

In summary, *Berger* ruled that the New York statute was unconstitutional in at least five respects. These same defects were present in K. S. A. 1971 Supp. 22-2513, and therefore its provisions must be deemed violative of the fourth amendment.

It would appear that at the same time, as found by the trial court, K. S. A. 1971 Supp. 22-2513 was also deficient in that in several areas it did not conform to the requirements set forth in 18 U. S. C. 2510, *et seq.* enacted in compliance with *Berger*. We note some of these sections pertinent here. Section 2511 outlaws all wiretapping and all disclosures of tapped communications except for those specifically authorized by the act. Section 2515 provides:

"Whenever any wire or oral communication has been intercepted, no part of the contents of such communication and no evidence derived therefrom may be received in evidence in any trial, hearing, or other proceeding in or before any court . . . if the disclosure of that information would be in violation of this chapter."

Section 2518 (10) (*a*) implements section 2515:

"Any aggrieved person in any trial, hearing, or proceeding in or before any court . . . of the United States . . . may move to suppress the contents of any intercepted wire or oral communication, or evidence derived therefrom, on the grounds that—

"(*i*) the communication was unlawfully intercepted;

"(*ii*) the order of authorization or approval under which it was intercepted is insufficient on its face; or

"(*iii*) the interception was not made in conformity with the order of authorization or approval. . . ."

Sections 2516-2518 contain elaborate provisions for the authorization of wiretaps in criminal investigations. They are restrictive rather than expansive in their terms, prescribing in detail the contents of applications for orders authorizing wiretaps, the findings to be made by the judge to whom application is made, the contents of his order, and restrictions upon what may be intercepted. Section 2518 (1) provides:

"Each application for an order authorizing or approving the interception of a wire or oral communication shall be made in writing upon oath or affirmation to a judge of competent jurisdiction and shall state the applicant's authority to make such application. Each application shall include the following information:

"(*a*) the identity of the investigative or law enforcement officer making the application, and the officer authorizing the application;

"(*b*) a full and complete statement of the facts and circumstances relied upon by the applicant, to justify his belief that an order should be issued, including (*i*) details as to the particular offense that has been, is being, or is about to be committed, (*ii*) a particular description of the nature and location of the facilities from which or the place where the communication is to be intercepted, (*iii*) a particular description of the type of communications sought to be intercepted, (*iv*) the identity of the person, if known, committing the offense and whose communications are to be intercepted;

"(*c*) a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous;

"(*d*) a statement of the period of time for which the interception is required to be maintained. . . ."

Subsection (3) of section 2518 prescribes the findings that the judge must make. In essence, they track the quoted provisions of subsection (1). Subsection (4) prescribes, in considerable detail, the contents of the judge's order approving a tap. These also track the provisions of subsection (1). Subsection (5) contains provisions limiting the duration of any authorized tap, including the following:

". . . Every order and extension thereof shall contain a provision that the authorization to intercept shall be executed as soon as practicable, shall be conducted in such a way as to minimize the interception of communications not otherwise subject to interception under this chapter, and must terminate upon attainment of the authorized objective, or in any event in thirty days."

The trial court found K. S. A. 1971 Supp. 22-2513 failed to re-

quire the applicant for a wiretap order to state his belief that a particular crime has been or is being committed and the underlying facts to support that belief. K. S. A. 1971 Supp. 22-2513 (1) provided:

"The application for the order shall be in writing, shall be under oath and shall particularly describe the crime or crimes under investigation. . . ."

We have just quoted the facts required by 18 U. S. C. § 2518 (1) (b) to be stated in a wiretap application.

In discussing this aspect of the New York statute *Berger* stated:

"We believe the statute here is equally offensive. First, as we have mentioned, eavesdropping is authorized without requiring belief that any particular offense has been or is being committed; nor that the 'property' sought, the conversations, be particularly described. The purpose of the probable-cause requirement of the Fourth Amendment, to keep the state out of constitutionally protected areas until · it has reason to believe that a specific crime has been or is being committed, is thereby wholly aborted. Likewise the statute's failure to describe with particularity the conversations sought gives the officer a roving commission to 'seize' any and all conversations." (pp. 58-59.)

In *United States v. Tortorello*, 480 F. 2d 764, the requirement of particularity was discussed:

"Particularity in an eavesdrop or wiretap application and order is critical to the constitutionality of a surveillance. The Fourth Amendment does not permit law enforcement officers to engage in lengthy surveillance of a suspected, or even a known, criminal regarding his associations and areas of legal and illegal operations, in the hope of obtaining evidence of some unspecified crime. The Act prohibits such 'strategic intelligence surveillance' by requiring, among other measures, that the application identify the particular offense suspected and the particular conversations anticipated. . . ." (p. 779.)

The degree of particularity required in an electronic surveillance application to satisfy the federal statute is a question resting primarily on the judge's analysis of the facts in each application. No more than a pragmatic and practical view of the application papers should be necessary. However, our statute required that the applicant merely state the crime or crimes under investigation, without requiring his belief that a particular crime has been, is being, or is about to be committed and the underlying facts to justify that belief. Under any test, it was deficient in this area when compared to the federal requirements. This discussion is applicable as well to the finding of probable cause federally required to be made by· the issuing judge.

Another defect in our statute found by the trial court is that it provided for extensions of the original warrant merely upon a show-

ing that "the facts which justified the issuance of the original order continue to exist and that such extension or renewal is in the public interest". 18 U. S. C. § 2518 (5) states: "Extensions of an order may be granted, but only upon application for an extension made in accordance with subsection (1) of this section *and the court making the findings required by subsection (3) of this section*". (Our emphasis.) Subsection (3) of § 2518 details the initial findings that must be made by the court which approves a wiretap application. Therefore, the judge in reviewing an extension application, must determine that present probable cause exists for extending the order, *i. e.*, make the same findings anew that were made when the first application was approved. *Berger* stated that merely finding that the facts which justified the original order continue to exist is insufficient to justify an extension of the interception. In *United States v. Giordano*, supra, the federal supreme court emphasized that extension orders do not stand on the same footing as original authorizations but are provided for separately. In addition, in an application for an extension under the federal act, the applicant must set forth ". . . the results thus far obtained from the interception, or a reasonable explanation of the failure to obtain such results". (§ 2518 [1] [*f*].) No similar requirement was contained in our statute.

There are other areas urged by appellees in support of the trial court's ruling in which our statute does not appear to have measured up to the restrictive standards fixed in the federal act. We shall touch upon them only briefly. The minimization requirement prescribed in 18 U. S. C. § 2518 (5) appears to be a crucial one. Essentially it provides that only those conversations relevant to the investigation actually be intercepted and that the interception be terminated immediately upon attainment of the authorization objective. Our statute contained no such safeguard. 18 U. S. C. § 2518 (8) (*d*), in conformity to *Berger*, required notice to persons affected by a wiretap application of certain facts in connection with interceptions made, absent a showing of good cause for not doing so. Again our statute had no such requirement. In *United States v. Chun*, 503 F. 2d 533, the court declared:

"As we analyze § 2518 (8) (*d*), the inventory notice provision is a central or at least a functional safeguard in the statutory scheme." (p. 542.)

Nor did our statute include any requirement for the safekeeping of intercepted communications as contained in 18 U. S. C. § 2518 (8) (*a*) and (*b*).

All in all we think it clear that the trial court correctly ruled that K. S. A. 1971 Supp. 22-2513 did not comply with Title III in key respects which were essential in the federal statutory scheme regulating electronic surveillance. Evidently our legislature was of the same mind since it has repealed our former statute and replaced it with statutes that largely track the language of Title III.

Did the trial court err in determining that the evidence obtained in the July 2, 1974, intercept under K. S. A. 22-2514 to 22-2519 (Weeks 1974) was "fatally tainted" by the previous illegally obtained wiretaps? Under 18 U. S. C. § 2515, already quoted, primary or derivative evidence secured by illegal wire interceptions must be suppressed on proper motion. The use of the term "derived therefrom" in the statute is a codification of the "fruit of the poisonous tree" doctrine. This means that where information about persons whose communications government wishes to intercept through wiretap orders has been obtained through prior illegal interceptions, the communications obtained under the later wiretap orders constitute evidence "derived" from the previous illegal interceptions within the meaning of the suppression statute (see *United States v. Giordano,* supra).

All the previous applications and orders used in obtaining the prior wiretap orders, as well as transcripts of certain evidence obtained in some of them and summaries of transcripts in others, and the logs of those interceptions were incorporated by reference in the July 2d application. These were all read and considered by the issuing judge. The state contends that putting aside all the evidence obtained from the prior wiretap orders, the independent evidence submitted constituted probable cause for issuance of the July 2d warrant. This concept of independent source was expressed in *Nardone v. United States,* 308 U. S. 338, 84 L. ed. 307, 60 S. Ct. 266. There the court held that a statutory prohibition of unlawfully obtained evidence encompassed derivative evidence as well. But the court reaffirmed that the connection between the unlawful activity and the evidence offered at trial may become so attenuated as to dissipate the taint and that facts improperly obtained may nevertheless be proved if knowledge of them is based on an independent source. The principle is illustrated constitutionally in *Wong Sun v. United States,* 371 U. S. 471, 9 L. ed. 2d 441, 83 S. Ct. 407. In enacting § 2515 Congress had no intention of changing the attenuation rule (S. Rep. 2184-2185). See also *United States v. Giordano,* supra. (416 U. S. at pp. 529-532.)

Whether independent sources of evidence sufficient to authorize the July 2d wiretap order existed was primarily a fact question based upon an evaluation of everything submitted in the July 2d application.

In announcing its findings orally the trial court stated that the proceedings under the new statute were fatally tainted with the prior intercepts; that "independent, reasonable grounds cannot be discerned in the application in July 1974 because of the intermixture to the extent that it cannot be separated out. The officer [Artman] had to rely on his knowledge gained from the Topeka intercepts to know the telephone numbers, to know Farha's place of business. Very likely a number of other things which, while he might have had other knowledge of it, couldn't be separated from the knowledge which he gained from the intercepts that I am ruling now are illegal and must be suppressed."

In its journal entry of judgment the court stated:

"2. That the present proceedings, under K. S. A. 22-2514 et seq., are fatally tainted by the wire interceptions made pursuant to the Shawnee County authorizations under K. S. A. 22-2513 and sufficiently independent, reasonable grounds cannot be found in the 1974 applications for those orders. The knowledge of the law enforcement officers making application for the 1974 Eavesdropping Orders is based on evidence which is so intermingled with evidence tainted by the prior applications that it cannot be separated and classified as independently acquired evidence."

The trial court upon its review of the file believed it would be speculation to find independent sources of evidence of probable cause sufficient to justify issuance of the wiretap order. A large portion of the application presented to the issuing judge consisted of evidence gathered from the prior interceptions—these items were incorporated into the affidavits of the district attorney and officer Artman. The district attorney's affidavit indicated he had had discussions with various officers involved in the prior investigations of gambling in Wichita. This obviously demonstrates a connection between all the communications already intercepted by wiretap and the asserted need for the later wiretap. The reliance upon the evidence already gathered plainly indicates this connection had not "become so attenuated as to dissipate the taint" (*Nardone v. United States*, supra, 308 U. S. at p. 341; *Wong Sun v. United States*, supra, 371 U. S. at p. 491). We have analyzed the factual contentions of the parties on each side of this issue and we cannot say the trial court erred in its determination. Hence,

the evidence gathered under this last wiretap order likewise comes within the congressional suppression mandate.

The judgment is affirmed.

APPROVED BY THE COURT.

FATZER, C. J., dissenting: I must respectfully dissent. In my opinion the court is being too technical in its construction of K. S. A. 1971 Supp. 22-2513 (1) (now repealed) that the Shawnee County wiretaps were illegally obtained. As provided in 18 U. S. C. § 2516(2) the attorney general of Kansas "authorized or approved" the interception of wire communication in the Shawnee County case. The attorney general's affidavit of March 21, 1975, specifically indicates he "reviewed, authorized and approved" the Shawnee County application—this complied with K. S. A. 1971 Supp. 22-2513 (1) and 18 U. S. C. § 2516(2). I would reverse the district court's judgment concluding that the Shawnee County wiretaps were illegally obtained.

KAUL, J., joins in the foregoing dissenting opinion.