STATE OF MONTANA, Plaintiff and Respondent, v. ERNEST
C. HANLEY, Defendant and Appellant.

No. 14807.
Submitted Sept. 11, 1979.
Decided Nov. 20, 1979.
605 P.2d 1087.

Richter & Lerner, Billings, Alan J. Lerner argued, Billings, for defendant and appellant.

Mike Greely, Atty. Gen., Richard A. Larson argued, Asst. Atty. Gen., Helena, Harold F. Hanser, County Atty., Billings, for plaintiff and respondent.

MR. JUSTICE HARRISON delivered the opinion of the Court.

Defendant Hanley appeals from his conviction on a felony charge of sale of dangerous drugs. The trial was in the District Court in Yellowstone County, the Honorable Charles Luedke presiding.

While on parole as a result of a previous drug conviction, defendant was arrested and placed in the Yellowstone County jail as a result of a complaint by his wife. Shortly after his incarceration, defendant requested a meeting with detectives from the Yellowstone County Criminal Investigation Division (C.I.D.).

Two detectives responded to defendant's request. At the meeting,

defendant informed the detectives that he wanted to become an informer to stop his wife's involvement in the Billings drug scene. As an expression of his sincerity, defendant provided the names of several individuals who were involved in drug-related activities in the Billings area. The C.I.D. approved defendant's becoming an informant, and detectives instructed defendant to infiltrate a large drug ring in Billings and gain information for setting up a large buy of drugs. As to the specifics of defendant's scope of authority as an informant, there was conflicting testimony. Defendant testified that the detectives told him to do what he had to do (to do anything necessary) to infiltrate these drug rings and establish a large buy. In defendant's mind, this may have included making purchases and sales of small amounts of drugs. The detectives, however, testified that defendant's role as an informant was simply to gain information concerning drug activities and that C.I.D. personnel would buy the drugs once the purchase had been arranged. Detective Ford testified that defendant was asked only to provide information, not to participate in drug transactions. Shortly after defendant agreed to becoming an informant, he was released from jail.

After his release, defendant became involved in a purchase and sale of drugs on January 2, 1979. Defendant was one of three men who arranged to sell a quantity of methamphetamine to Tony Carrier, an undercover agent working for the C.I.D. At approximately 8:00 a.m. on January 2, 1979, Carrier received a call from one of the three men with whom Carrier had dealt before and was told that there was a quantity of methamphetamine for sale. Defendant's participation in the phone call was primarily to inform Carrier of the quality of methamphetamine, otherwise known as "crank," which was available. Carrier arranged to purchase the drugs from the three men at a meeting later that day at Sambo's, a Billings restaurant. Carrier recorded the telephone conversation without a search warrant by means of a device attached to his phone.

Prior to the meeting, Carrier contacted the C.I.D. and told them about the proposed transaction. The C.I.D. applied to the District

Court for an order or search warrant to electronically monitor the sale. Judge Luedke granted the order, and Carrier was fitted with an electronic monitoring device. Carrier later met defendant and the other two men at Sambo's. Two plain clothes officers were observed by the men in the restaurant, however, and the meeting was transferred to defendant's residence where the details of the purchase were discussed. Carrier agreed to buy two grams of methamphetamine for approximately $65 per gram. Defendant and Carrier then left for another residence where defendant purchased and picked up the drugs. Defendant gave Carrier two small packages of methamphetamine and took a small portion of one of the packages as his "cut." Carrier then drove defendant to his residence, returned to the C.I.D. office and turned in the packages for analysis. The state crime laboratory tested the substance in the packages and confirmed that it was methamphetamine.

On January 19, 1979, defendant was arrested for the criminal sale of dangerous drugs. Prior to his arrest, defendant made no effort to contact officers regarding the sale. Defendant appeared with counsel on January 24, 1979, and entered a plea of not guilty. On March 7, 1979, defendant moved to suppress all evidence on grounds of constitutional infringement of his right to privacy. The motion related to the electronic monitoring of conversations of the sale of drugs. The District Court denied the motion to suppress on March 8, 1979, and the trial also began on that day. At trial, the State introduced the tape of the events of the sale and the drugs seized in the sale. Defendant was convicted of the charge on March 9, 1979, and sentenced to ten years in the Montana State Prison with five years suspended.

Defendant raises three issues on appeal. However, it is only necessary for us to consider one of those issues, the result of which is determinative in this case:

Did the District Court err in failing to suppress the taped conversation of the sale and the drugs seized in the sale because Montana does not have and is required to have a specific statutory scheme

regarding electronic surveillance under Title III of the Omnibus Crime Control and Safe Streets Act?

At the outset we should state that we have never been squarely confronted with the issue of whether laws regarding electronic surveillance in Montana conform with the requirements of federal law. This is an issue of first impression. Previously, however, we have discussed the permissibility of electronic surveillance with respect to Montana law. In the context of a defendant's right to privacy under the Montana Constitution, we stated in *State v. Brackman* (1978), 178 Mont. 105, 582 P.2d 1216, 1221, that "[a] decision in favor of defendant would not outlaw electronic monitoring, but only impose a warrant requirement before proceeding." In giving implicit approval to the activity of electronic surveillance in *Brackman*, however, we were neither confronted with nor had occasion to consider the impact of federal law with respect to that activity. It is to that issue that we must now turn our attention.

Defendant contends that the drugs seized in the sale and the taped conversation of the sale should have been suppressed by the trial court because there is no statutory scheme in Montana authorizing electronic surveillance by law enforcement officials. It is argued that Title III of the Omnibus Crime Control and Safe Streets Act effectively preempts states from the field of electronic surveillance unless they have specific statutory schemes which permit the activity and meet the minimum requirements of Title III. Because there is no statutory scheme in Montana, defendant argues that the monitoring in the instant case was illegal.

Title III of the Omnibus Crime Control and Safe Streets Act was passed by Congress in 1968. In general terms, the Act prohibited the interception of oral and wire communications, with limited exceptions, except where court authorization was obtained by law enforcement officials. S.Rep.No. 1097, 90th Cong.2d Sess. (1968), U.S.Code Cong. & Admin.News 1968, p. 2112. The Act was drafted with a dual purpose: first, it attempted to protect privacy in communications, and secondly, it attempted to

delineate on a uniform basis the circumstances and conditions under which the interception of wire or oral communications was authorized. We do not have to address our state constitutional provision of right to privacy, Art. II, Section 10, 1972 Mont.Const., at this time.

The Act was a direct response to constitutional standards the United States Supreme Court had enumerated regarding the right to privacy and electronic surveillance in *Berger v. New York* (1967), 388 U.S. 41, 87 S.Ct. 1873, 18 L.Ed.2d 1040, and *Katz v. United States* (1967), 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576. In those cases, the Supreme Court abandoned the "trespass doctrine" and held that the constitutional right of privacy protects "people — and not simply 'areas' — against unreasonable search and seizures." 57 Cal.L.Rev. 1182, 1192; *Katz*, 389 U.S. at 353, 88 S.Ct. at 512. The Senate Report to Title III cited the standards enumerated in those cases for the issuance of a warrant to intercept wire or oral communications:

"(1) Particularity in describing the place to be searched and the person or thing to be seized. (2) Particularity in describing the crime that has been, is being, or is about to be committed. (3) Particularity in describing the conversation sought. (4) Limitations . . . which would (a) prevent his searching unauthorized areas and (b) prevent further searching once the property sought is found. (5) Probable cause in seeking to renew the eavesdrop order. (6) Dispatch in executing the eavesdrop order. (7) Requirement that the executing officer make a return on the eavesdrop order showing what was seized. (8) A showing of exigent circumstances in order to overcome the defect of not giving prior notice." S.Rep.No.1097, 90th Cong.2d Sess. (1968), U.S.Code Cong. & Admin.News 1968, p. 2161.

Title III had particular significance to states. One of the objectives of Title III was to ensure nationwide compliance with *Berger* and *Katz* decisions. The Senate Report to Title III stated:

"On the state level, there is little uniformity. Most states have 'malicious mischief' statutes . . . Not all of them however, are

broad enough to cover illegal wiretapping . . . Only a few States have enacted statutes dealing with other forms of electronic surveillance. Few States, too, have set up court order systems for law enforcement officers. Even those existing statutes, however must be reformed . . . The need for comprehensive, fair and effective reform setting uniform standards is obvious . . . This can only be accomplished through national legislation." S.Rep.No. 1097, 90th Cong.2d Sess. (1968), U.S.Code Cong. & Admin.News 1968, p. 2156.

By enacting Title III, however, Congress did not intend to preempt state legislation from the field of electronic surveillance. *Halpin v. Superior Court of San Bernardino County* (1972), 6 Cal.3d 885, 101 Cal.Rptr. 375, 495 P.2d 1295. Rather, it sought to permit concurrent regulation of the subject. *People v. Conklin* (1974), 11 Cal.3d 648, 114 Cal.Rptr. 241, 522 P.2d 1049; *State v. Farha* (1975), 218 Kan. 394, 544 P.2d 341. States were free to devise their own statutory schemes under Title III. Title III was simply an enabling provision: before state officials could lawfully monitor oral and wire communications, a state legislature was required to specifically authorize such activities. 56 B.U.L.Rev. 600, 601 (1972). A state was also free *not* to adopt a statutory scheme, but if it chose not to adopt, state officials were precluded from conducting electronic surveillance.

The requirement that a state adopt a statutory scheme as a condition to conducting electronic surveillance is self-evident from the provisions of Title III. Several provisions of the Act require and incorporate state statutes. For example, paragraph 2 of section 2516 of Title III provides:

"The principal prosecuting attorney of any State, or the principal prosecuting attorney of any political subdivision thereof, *if any such attorney is authorized by a statute of that State to make application to a State court judge of competent jurisdiction for an order authorizing or approving the interception of wire or oral communications*, may apply to such judge, for, and such judge may grant in conformity with Section 2518 of this chapter *and*

*with the applicable State statute an order authorizing, or approving the interception . . ."* 18 U.S.C. § 2516(2). (Emphasis added.)

■ Title III also imposes another requirement for states. If a state chooses to allow electronic surveillance by adopting a statutory scheme, the scheme must be at least as or more restrictive than the regulations of Title III. The Senate Report to the Act states:

"The State statute must meet the minimum standards reflected as a whole in the proposed chapter. The proposed provision envisions that States would be free to adopt more restrictive legislation, or no legislation at all, but not less restrictive legislation." S.Rep.No.1097, 90th Cong.2d Sess. (1968), U.S.Code Cong. & Admin.News 1968, p. 2187.

The minimum standards of Title III are set forth in 18 U.S.C. § 2510-2520. With respect to states, two sections are particularly important. Section 2516 indicates that the principal prosecuting attorney of any state or other persons authorized by state statute may apply to a district court for an order authorizing or approving an interception of wire or oral communications. That section further provides that a district judge may grant an order for interception in conformity with the application and the applicable state statute, when the interception may provide evidence of various felonies enumerated in the applicable state statute.

Section 2518 indicates that the application must be made in writing upon oath or affirmation and state the applicant's authority to make application. The application shall include: (1) the identity of the applicant and the officer authorizing the application; (2) a detailed statement of the particular facts and circumstances to justify the applicant's belief that an order should be issued; (3) a statement as to whether other investigative procedures have been attempted or why they have not been attempted or are too dangerous; (4) a statement specifying the time during which the interception will be maintained; (5) a statement as to all prior applications for interceptions involving the same persons, facilities or places and the results of such applications; (6) if the application is for an

extension, a statement setting forth the results obtained or an explanation of the failure to obtain such results.

Paragraphs (3) and (4) of section 2518 indicate under what circumstances an interception order will be issued and what the order shall contain. Before the issuance of an order, the District Court judge must determine whether (1) there is probable cause to believe that one of the enumerated felonies is being, has been, or is about to be committed; (2) there is probable cause to believe that evidence will be obtained through such interception; (3) normal investigative procedures have been attempted or are unlikely to succeed or are too dangerous; (4) and whether there is probable cause to believe that the premises where the interception occurs are leased to, listed in the name of, or are commonly used by such person.

The interception order shall specify: (1) the identity of the person, if known, whose communications are to be intercepted; (2) the place of interception; (3) the type of communication sought and the offense to which it relates; (4) the agency authorized to intercept and the person authorizing application; and (5) the period of time during which the interception is to occur.

In this case, we are confronted with two questions. First, we are asked to determine whether Montana must have a specific statutory scheme for electronic surveillance before public officials can lawfully monitor oral and wire communications in this state. It is clear from both the provisions and the congressional intent of Title III that the answer must be given in the affirmative.

Next we are asked to consider whether Montana has in fact adopted a statutory scheme regarding electronic surveillance which is at least as restrictive as the regulations of Title III.

Montana has only two statutes which may be said to constitute a "statutory scheme" for electronic surveillance. These statutes have traditionally represented the authority by which law enforcement officials have been authorized to electronically monitor oral and wire communications in Montana. Section 45-8-213, MCA, the statute which defines the offense of privacy in communications,

implicitly permits electronic surveillance by public officials and provides in pertinent part:

"A person commits the offense of violating the privacy in communications if he knowingly or purposely . . . (c) records or causes to be recorded any conversation by use of a hidden electronic or mechanical device which reproduces a human conversation . . . *Subsection (c) does not apply to duly elected or appointed public officials or employees when the transcription or recording is done in the performance of official duty* . . ." (Emphasis added.)

Section 46-5-202, MCA, sets forth the grounds for the issuance of a search warrant and provides:

"Any judge may issue a search warrant upon the written application of any person, made under oath or affirmation before the judge which: (1) states that an offense has been committed; (2) states facts sufficient to show probable cause for the issuance of the warrant; (3) particularly describes the place or things to be searched; and (4) particularly describes the things to be seized."

It is patently clear that these statutes fail to meet the minimum requirements of Title III or the standards enumerated by the United States Supreme Court in *Berger* and *Katz*. Among other things, they fail to require a showing of exigent circumstances to overcome the defect of not giving prior notice; they fail to state what items of information should be included in the application for a warrant; and they fail to outline the general procedures by which law enforcement officials obtain warrants for electronic surveillance.

We hold, therefore, that the District Court erred in failing to suppress the tape of and the drugs seized in the sale, and defendant's conviction must be reversed.

As an aside, we also feel compelled to mention one other matter. The State contended in this case that the monitoring of the sale of drugs was excepted from the provisions of Title III and needed no prior judicial authorization for the interception to occur. 18 U.S.C. § 2511(2)(c) provides:

"It shall not be unlawful under this chapter for a person acting under color of law to intercept a wire or oral communication, where such person is a party to the communication or one of the parties to the communication has given prior consent to such interception . . ."

It bears repeating that we have required prior judicial authorization for all cases of intercepting communications, even before today's consideration of Title III. In *State v. Brackman*, supra, we imposed the requirement that, in view of our state constitutional right of privacy, law enforcement officials must first obtain a warrant before intercepting any communication. Today, however, we hold that even a warrant will not suffice. Our search warrant statute fails to comply with the minimum requirements of Title III and the standards of *Berger* and *Katz*. This is a legislative problem that should be clarified and a position with respect to electronic surveillance must be taken by either adopting or not adopting a specific statutory scheme that will meet the requirements of Title III and the standards of *Berger* and *Katz*.

Reversed.

MR. CHIEF JUSTICE HASWELL and JUSTICES DALY and SHEEHY concur.